UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

PATRICK S. BRADY,

                             Plaintiff,

    -against-

WAL-MART STORES, INC., YEM HUNG
CHIN and JAMES BOWEN,

                       Defendants.

------------------------------------------------------------X

CV-03-3843
(U.S.M.J. J. Orenstein presiding)

## DECLARATION OF DOUGLAS H. WIGDOR
## IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEYS' FEES, COSTS AND PRE- AND POST-JUDGMENT INTEREST

      DOUGLAS H. WIGDOR, an attorney admitted to practice before the courts of

this State, hereby deposes and says, upon information and belief, under penalty of

perjury, that:

    1. I am a member of the bar of this Court and a member of the law firm of

Thompson Wigdor & Gilly LLP ("TWG"). We are counsel for Plaintiff Patrick S. Brady

("Plaintiff") in the above-referenced action against Defendants Wal-Mart Stores, Inc.

("Wal-Mart"), Yem Hung Chin ("Chin") and James Bowen ("Bowen") (collectively,

"Defendants").

    2. I submit this declaration along with the attached exhibits in support of Plaintiff's

Motion for Attorneys' Fees, Costs and Pre- and Post-Judgment Interest ("Plaintiff's

Motion").

    3. On June 21, 2005 United States Magistrate Judge James Orenstein issued a

Memorandum and Order and on June 23, 2005 Judgment was entered in this case as

follows: (i) Plaintiff to recover from Defendants Wal-Mart Stores, Inc. and Yem Hung Chin the amount of $2,500,000 in compensatory damages;  (ii) Plaintiff to recover from Defendant Wal-Mart Stores, Inc. the amount of $300,000 in punitive damages; (iii) Plaintiff to recover from Defendant Wal-Mart Stores, Inc. the amount of $2 in nominal damages; (iv) the jury's award of $9,114 in economic damages is stricken; (v) Plaintiff's application for an award of front pay is denied; and (vi) all claims against Defendant James Bowen are dismissed with prejudice.  A true and correct copy of the Judgment and Memorandum and Order is attached hereto as Exhibit A.

4.  We were first consulted by Plaintiff in or about September 2002 and have continued as counsel for Plaintiff from that time through the present.[1]

5.  Plaintiff seeks attorneys' fees for the time his counsel reasonably expended in connection with this matter.  TWG maintains contemporaneous computerized records of time expended in all matters through the use of Time Matters 5.0 ("Time Matters"), a comprehensive litigation management software program.  Time Matters tracks and organizes time, expenses and other information concerning all matters handled by the firm.

6.  Every attorney who worked on this case has kept contemporaneous time records of the time they spent in this litigation.  The detailed time, billing and expense records are set forth in schedules created and organized by Time Matters.  Attached hereto as Exhibit B are contemporaneous detailed billing and time records associated with this matter, organized by attorney or staff member.

---

[1] Plaintiff was originally a client of the Law Offices of Scott Browning Gilly until February 2003, at which time TWG was formed.

7. Attached hereto as Exhibit C are contemporaneous detailed expense records, associated with this matter.

8. Mr. Gilly and my customary hourly rate is $450 and Ms. le Roux's is $300. The hourly rates of the other lawyers and staff at TWG are consistent with the billing rates at firms that handle individual and multi-plaintiff employment cases. TWG regularly charges the rates identified on the time records submitted herewith to clients who retain the firm on an hourly-fee basis in its employment litigation practice. In addition, after consulting with other attorneys in the field, we have determined that TWG's hourly rates are consistent with the rates charged by other attorneys and staff of comparable experience and expertise. Attached as Exhibits D and E are Declarations from A. Kathleen Tomlinson and Frederick K. Brewington who are all well-known litigators and attest to the fact that TWG's hourly rates are reasonable.

## THE FACTS UNDERLYING THIS ACTION

9. Plaintiff is a twenty-one-year-old man who suffers from cerebral palsy. On July 18, 2002, Plaintiff applied for a job with Wal-Mart's Pharmacy in the Centereach, New York store.

10. Prior to extending an offer of employment to Plaintiff, Wal-Mart required him to sign a job description on July 30, 2002 -- <u>before</u> he received a conditional offer of employment -- which impermissibly inquired whether or not he could perform the essential functions of the sales associate position with or without a reasonable accommodation.

11. In early August 2002, a Wal-Mart pharmacist, Joan Little, interviewed Plaintiff and recommended that he be hired.

12. Plaintiff reported for work in the pharmacy on Sunday, August 11, 2002. He was given a vest with "Wal-Mart pharmacy" embroidered on it and instructed to stock merchandise and dispense prescriptions. During the course of the day, Defendant Chin claimed to notice that Plaintiff was slow and that he appeared to have difficulty matching the customers' name with their prescriptions. However, Defendant Chin never confronted Plaintiff about her perception that he was having difficulty.

13. At the end of his shift, Plaintiff requested his schedule for the upcoming week. Defendant Chin told him that she was going to make up the schedule at home that night and that she would call him with his schedule for the week.

14. Plaintiff did not hear from Defendant Chin for several days. On or about Thursday, August 15, 2002, Plaintiff went to the Wal-Mart store to see about his schedule. When Defendant Chin saw him, she said that she had been meaning to call but did not get around to it. She then asked him if he would be opposed to working in another department. She claimed that they really needed to hire a pharmacy tech, rather than a pharmacy assistant. Defendant Chin then told Plaintiff to come to work on Saturday and Sunday until they figured out what to do with him.

15. During the Saturday and Sunday shifts, Plaintiff came to work as instructed and spent most of his two shifts stocking shelves rather than working in the pharmacy. At the end of his shift on Sunday, he asked about his schedule for the upcoming week. Again, he was told that Defendant Chin would call him.

16. Once again, however, Defendant Chin never contacted Plaintiff. Instead, he was forced to return to the store on or about Thursday, August 22, 2002. Defendant Chin was not there, so Plaintiff left his phone number with the pharmacist on duty, Tom, who

assured him that he would have Defendant Chin call Plaintiff.  After she still did not do so, Plaintiff returned to the store yet again, on Friday, August 23, 2002.  Defendant Chin appeared visibly annoyed and sent Plaintiff to the personnel department.

17. The personnel manager informed Plaintiff that the only open position that coincided with his availability was collecting shopping carts and garbage.  The duties of this position were inferior to those of the pharmacy associate and the cart and garbage collecting position also had different uniform requirements and provided significantly reduced opportunities for advancement.

18. Plaintiff was the first employee transferred out of the Centereach Wal-Mart pharmacy after only one day.  He was denied the 90-day probationary period and training provided to other new employees to learn the job and also received no coaching in violation of Wal-Mart's own policies.  Moreover, Defendant Chin never entered into a dialogue with Plaintiff about whether he required an accommodation for his disability when she claims he was having difficulty performing the duties of the job.

19. After being transferred out of the pharmacy to collect shopping carts and garbage in the parking lot, Plaintiff sought the assistance of his father, Patrick Brady, Sr.  Mr. Brady came to the store and told the assistant store manager that he hoped that Plaintiff's disability had not played any role in his transfer.  Defendant Bowen told Mr. Brady that he thought that Defendant Chin had handled the situation improperly and that she had told him that she thought Plaintiff could not handle the pharmacy position.  Defendant Bowen told Mr. Brady that new employees have up to 90 days to train for a new position, and that Plaintiff should have had more of a chance to learn the pharmacy job.  Plaintiff was therefore transferred a second time to the food department where he was asked to

stock shelves and zone merchandise.  At no time was Plaintiff offered a return to his old position in the pharmacy, even though it remained vacant.

20. Plaintiff was then given a work schedule for the food department that directly conflicted with his school schedule, which he had provided to Defendants.  After being lied to several times and shunned to the parking lot to collect carts and garbage, it was apparent that it was futile for Plaintiff to complain yet again and that he would not be restored to the pharmacy associate position, despite its continuing vacancy.  Unable to work because of his school schedule and stripped of his original position in the Pharmacy department, Plaintiff found his continued employment with Wal-Mart to be intolerable.  Accordingly, Plaintiff called Wal-Mart and informed an assistant manager that he could not return to work because of the manner in which he had been treated.

21. Plaintiff experienced extreme emotional distress, frustration, and despair, and underwent treatment by a psychologist for anxiety and depression.

22. Plaintiff obtained new employment in June 2003 at a Stop & Shop as a supermarket bagger at a rate of $5.15 per hour.

23. At the time of Plaintiff's employment and throughout this litigation, Wal-Mart was under the jurisdiction of a Consent Decree that required ADA training for all employees involved in the hiring and interviewing process.  In addition, pursuant to the Consent Decree, Wal-Mart agreed that it would no longer engage in "any employment practice which unlawfully discriminates against an employee . . . under the ADA."  In addition, the Decree also abolished Wal-Mart's "Matrix of Essential Job Functions" in favor of job descriptions to be given to applicants after they receive a conditional offer of employment.

6

24. The Wal-Mart managers and associates involved in Plaintiff's interviewing, hiring and transfer were not trained in the ADA. Wal-Mart failed to comply with the terms of the Consent Decree which required that they both view training materials and pass a test by skipping the training materials and retaking the test portion several times until they finally received a passing score.

25. Amazingly, when TWG raised the Consent Decrees for the first time in this litigation, even Defendants' counsel did not know of their existence. Obviously, these documents were not produced by Defendant Wal-Mart in discovery, but required extensive research by TWG to uncover their existence.

## RELEVANT PROCEDURAL HISTORY OF THE ACTION

26. Plaintiff entered into a Retainer Agreement with the Law Offices of Scott Browning Gilly on September 20, 2002 in connection with the various acts of employment and disability discrimination he was subjected to by Wal-Mart.[2] Prior to entering into the Retainer Agreement, counsel consulted with Mr. Brady to evaluate the merits of his case and advised him of the legal challenges he would face.

27. Plaintiff filed an EEOC ("Equal Employment Opportunity Commission") Charge alleging that Wal-Mart had violated the ADA on November 18, 2002. Counsel prepared and drafted the charge of discrimination. Prior to drafting the charge, counsel reviewed and analyzed the facts underlying Plaintiff's claims of discrimination.

28. Upon information and belief, Defendants retained Brown Raysman Millstein Felder & Steiner, LLP ("Brown Raysman") as their counsel in early 2003. Brown Raysman has a Martindale AV rating in civil trial practice, several offices in the New

---

[2] Plaintiff became a client of Thompson Wigdor & Gilly LLP, following its founding in early 2003, when he executed a retainer on July 28, 2003, which replaced his retainer as Mr. Gilly's client.

York metropolitan area, and employs at least 220 attorneys and a full staff of paralegals, secretaries and litigation support.

29. Wal-Mart's lead counsel is a partner at Brown Raysman, Joel L. Finger, who, according to his biography, "is one of the most experienced and well-respected attorneys in his field today." Attached hereto as Exhibit F is a copy of Mr. Finger's biography.

30. In a December 9, 2004 article in the National Law Journal, Richard Raysman, Managing Partner of the firm's New York office, confirmed that Brown Raysman's "high-end" partner rate was $600 per hour. A copy of the article is attached hereto as Exhibit G.

31. Moreover, a survey of billing rates published by the National Law Journal on December 6, 2004 revealed that Associate billing rates at Brown Raysman range from $190 per hour to $400 per hour depending upon seniority, and that partner rates range from $350 per hour to $600 per hour. A copy of the survey is attached hereto as Exhibit H.

32. In February 2003, the EEOC forwarded Wal-Mart's position statement to Plaintiff. Counsel prepared and submitted a response to Wal-Mart's position statement. Plaintiff received his right to sue notice on May 13, 2003.

33. Plaintiff filed and served the Summons and Complaint in this matter on August 6, 2003. The Complaint alleged six causes of action: (1) discrimination and harassment in violation of the ADA based on the discriminatory transfers, the constructive discharge and a hostile work environment; (2) a violation of the ADA based on Wal-Mart's practice of conducting pre-employment disability-related questions and medical examinations without first providing a conditional offer of employment; (3) a violation of the New

8

York State Human Rights Law ("NYHRL") based on the discriminatory transfers, the constructive discharge and a hostile work environment; (4) aiding and abetting in violation of the NYHRL based on Defendant Chin and Defendant Bowen's participation in discriminatory conduct; (5) a claim of negligent hiring, retention and supervision based on Wal-Mart's duty to prevent its personnel, such as Defendant Chin and Defendant Bowen, from engaging in discriminatory and tortuous conduct; and (6) a claim of intentional infliction of emotional distress.

34. Defendants served their Answer on Plaintiff on October 13, 2003.

35. Plaintiff served and filed an Amended Complaint on October 8, 2004, alleging an additional cause based on Wal-Mart's violation of the ADA for its failure to provide Plaintiff with a reasonable accommodation by failing to initiate a discussion with Plaintiff regarding the need for an accommodation based on his obvious and known disability.

36. Defendants served their Amended Answer on Plaintiff on November 15, 2004.

37. During the trial of this matter, Plaintiff again amended the Complaint, with leave of the Court, further alleging that Wal-Mart's failure to provide Plaintiff with a reasonable accommodation also constituted a violation of the New York State Human Rights Law.

## DISCOVERY AND DEPOSITIONS

38. The parties conducted exhaustive discovery in this matter over the course of sixteen months, during which time Defendants took a steadfast position and continually sought to restrict Plaintiff's access to certain documents and information. The parties' discovery disputes generated vast correspondence (both written and by telephone) and required judicial intervention by way of several motions. Despite Defendants' resistance,

Plaintiff was still able to obtain crucial and necessary documents and information prior to the trial of this action.

39. Discovery began on October 28, 2003, with the service of Defendants' First Request for the Production of Documents and continued through the eve of trial with the depositions of Defendants' experts Brian Sullivan and Philip Muskin on February 11, 2005, three days before the trial commenced.

40. Defendants engaged in thorough fact discovery and issued the following specific demands on Plaintiff: (1) Defendants' First Request for the Production of Documents on October 28, 2003; (2) Defendants First Set of Interrogatories on October 29, 2003; and (3) Defendant's Second Request for the Production of Documents on April 29, 2004. Preparing Plaintiff's individual responses and objections as well as reviewing the documents and information responsive to these numerous requests required significant time and attention.

41. Plaintiff fully exercised his right to engage in comprehensive discovery and issued the following specific demands: (1) Plaintiff's First Set of Interrogatories to Defendants on November 18, 2003; (2) Plaintiff's First Request for the Production of Documents to Defendants on November 18, 2003; (3) Plaintiff's First Request for Entry Upon Land for Inspection on September 9, 2003; (4) Plaintiff's Second Request for the Production of Documents to Defendants on October 6, 2004; (5) Plaintiff's Third Request for the Production of Documents to Defendants on October 22, 2004; (6) Plaintiff's Second Set of Interrogatories to Defendant on October 22, 2004; and (7) Plaintiff's Fourth Request for the Production of Documents on November 5, 2004. Plaintiff also amended his Rule 26(a)(1) Initial Disclosures three times. Drafting these various

discovery devices required considerable time and attention.  Counsel also spent significant time and effort in the review and analysis of Defendants' responses and objections to these devices as well as in the analysis of the responsive documents and information Defendants ultimately provided.

42. Discovery in this case also involved significant motion practice, and several discovery disputes required judicial intervention.

43. In an Order dated April 21, 2004, Magistrate Judge E. Thomas Boyle overruled Defendants' assertion of the attorney-client privilege relating to Defendant Bowen's answering certain deposition questions.

44. In a June 2, 2004 letter motion, Plaintiff sought to compel the production of documents and information, including information relating to prior claims of disability discrimination against Wal-Mart, Wal-Mart policies, procedures, training, personnel files and government filings, Wal-Mart's annual reports, information about all persons nationwide denied employment as a result of pre-employment inquiries, Wal-Mart advertisements and an order compelling the deposition of Wal-Mart's ADA coordinator. Magistrate Boyle required oral argument of these issues on June 22, 2004 and ultimately ruled in Plaintiff's favor, requiring Defendant to produce Wal-Mart policies, procedures, training and personnel files, advertisements.  Defendant was also compelled to produce Linda Whittaker, its ADA coordinator, for a deposition.

45. On December 7, 2004, Magistrate Boyle entered a Memorandum Opinion and Order denying Plaintiff's request for entry and inspection of the Centereach Wal-Mart store.  Plaintiff fully researched and briefed these issues for the Court.

46. There were eighteen depositions taken in this case.

47. Defendants took 7 depositions: (1) Plaintiff (on two separate occasions); (2) Mark Killingsworth, Plaintiff's economic expert; (3) Dr. Krishna Gujauarty, Plaintiff's treating psychologist; (4) Karen Brady, Plaintiff's mother; (5) Patrick Brady, Sr., Plaintiff's father; (6) Frank Albergo, owner of the Village Chemist; and (7) Sally Salvo, manager of the Village Chemist.

48. Counsel prepared for the depositions by reviewing the documents and pleadings relevant to each deponent and drafting extensive deposition outlines.  Plaintiff took eleven depositions in this case: (1) Defendant Chin; (2) Defendant Bowen; (3) Doreen Bates, the Wal-Mart personnel manager and human resources representative; (4) Camille Egan, the Wal-Mart employee who interviewed Plaintiff and New Employee Training Coordinator; (5) Paul Busby, the Wal-Mart regional Vice President; (6) Ted Wicks, the Centereach Wal-Mart Assistant Store Manager; (7) Joan Little, a Wal-Mart Pharmacy Department employee who interviewed Plaintiff and recommended that he be hired; (8) Philip Muskin, Defendants' psychological expert; (9) Brian Sullivan, Defendants' economic expert; (10) Linda Whittaker, the Wal-Mart ADA Coordinator; and (11) Kevin Carter, who was deposed pursuant to F.R.C.P. 30(b)(6).

49. With the exception of the depositions of Ms. Whittaker and Mr. Busby, all remaining depositions took place in the greater New York metropolitan area.  Despite the vast resources of Wal-Mart, counsel was required to travel to Bentonville, Arkansas for Ms. Whittaker's deposition and to Albany, New York for Mr. Busby's deposition.

50. The parties also attended numerous court conferences relating to discovery issues and deadlines and the Court extended the deadline for the completion of discovery on three occasions, finally ordering the close of discovery on December 31, 2004.

## MEDIATION

51. On November 19, 2003, Magistrate Boyle ordered this case to mediation pursuant to Eastern District of New York Local Civil Rule 83.11. Accordingly, Plaintiff drafted an extensive mediation statement in preparation for the mediation, which was held on February 11, 2004.

52. The mediation was ultimately unsuccessful because Defendant both refused to consider Plaintiff's demand and refused to propose a counter offer. However, the mediation was valuable in that it assisted Plaintiff by reinforcing the importance of certain legal and factual issues related to the matter.

## PRE-TRIAL MOTIONS

53. Defendants filed a motion for summary judgment on January 7, 2005. Plaintiff filed his Opposition to Defendants' Motion for Summary Judgment on January 27, 2005. The Court denied Defendant's motion for summary judgment and permitted all of Plaintiff's claims to go forward to trial.[3]

54. On January 14, 17 and 18, 2004, Defendants served several motions *in limine* seeking to exclude evidence at trial concerning: (1) Wal-Mart's current and past discriminatory policies and practices in violation of the ADA, including the entry of a number of Consent Decrees against Wal-Mart in actions by the EEOC as well as Wal-Mart's contempt for violations of those Consent Decrees; (2) Plaintiff's disability prior to being interviewed and hired at Wal-Mart; (3) Plaintiff's claim for front pay damages; and (4) Plaintiff's performance for other employers. Defendants also requested that the Court bifurcate the trial between liability and damages.

---

[3] Plaintiff decided not to pursue his claim for negligent hiring, retention and supervision at summary judgment.

55. On February 8, 2005, Plaintiff submitted a memorandum of law in opposition to Defendants' motions *in limine* and in opposition to Defendants' request to bifurcate the trial between liability and damages.

56. Magistrate Judge James Orenstein denied Defendants' motions *in limine* and their request to bifurcate the trial.

## TRIAL

57. The trial of this matter lasted six full days, beginning on February 14, 2005 with jury selection and culminating on February 23, 2005, when the jury awarded a verdict in Plaintiff's favor totaling more than $7.5 million.  Attached hereto as Exhibit I is a copy of the Verdict Sheet.

58. In addition to the six days at trial, the parties attended a charging conference on February 21, 2003 that lasted a full day.

59. In preparation for trial, counsel prepared, organized and analyzed over 50 trial exhibits to be submitted into evidence at trial.

60. During the course of the trial, Plaintiff's counsel prepared for and examined eight witnesses: (1) Plaintiff; (2) Patrick Brady, Sr.; (3) Karen Brady; (4) Frank Albergo, the owner of the Village Chemist pharmacy and former employer of Plaintiff; (5) Sally Salvo, the manager of the Village Chemist; (6) Joan Little, a Wal-Mart Pharmacy Department employee who interviewed Plaintiff and recommended his hire; (7) Dr. Krishna Gujavarty, Plaintiff's treating psychologist; and (8) Kevin Carter, the F.R.C.P. 30(b)(6) witness.  Plaintiff's counsel also prepared for and cross-examined six witnesses: (1) Defendant Chin; (2) Defendant Bowen; (3) Ted Wicks; (4) Doreen Bates; (5) Kelly Collins; and (6) Dr. Philip Muskin.

14

61. Plaintiff prevailed on the majority of the causes of action he alleged, and the jury awarded a verdict totaling over $7.5 million which amount was unprecedented in this district for a single plaintiff ADA case.  Furthermore, the verdict was one of the largest single-plaintiff jury verdicts ever rendered under the ADA in the United States, which alone is testament to the astounding success of this action.

## MEDIA ATTENTION REGARDING SUCCESS OF VERDICT

62. The trial and the jury's award of $7.5million in this matter received extensive media attention and was reported by regional, national and international news sources. Attached hereto as Exhibit J are selections of the widespread media coverage of the trial and verdict rendered in this matter.

63. The media attention and success of this case has had a direct impact on this law firm by immediately inciting an increased call volume of prospective civil rights clients seeking legal assistance to redress alleged discrimination against them by both their employers and other public accommodations and organizations.

64. The media attention has also renewed a debate about the appropriateness of the caps under the federal anti-discrimination laws for companies such as Wal-Mart.

65. The firm has also been contacted by several prominent groups, including the disability section of the AARP and the EEOC, hoping to assist in briefing should this matter be appealed to the Second Circuit.

66. As a result of this lawsuit, the EEOC is also considering possible violation proceedings concerning the nationwide Consent Decree governing Wal-Mart's ADA practices.

## POST-TRIAL MOTIONS

67. In addition to the present motion, which has required considerable time and effort, Defendants have made several post-trial motions.

68. Defendants made motions to: (1) reduce the punitive damages awarded by the jury to the statutory cap of $300,000; (2) exclude Plaintiff's awards of back pay and front pay; and (3) deny Plaintiff's entitlement to injunctive relief regarding the Consent Decree. Plaintiff's counsel expended significant time in preparing substantive responses to these issues.

69. Defendants have also declared that they will be moving for Judgment as a Matter of Law under Rule 50 or alternatively, for a new trial under Rule 59. In anticipation of these motions, Plaintiff has already conducted extensive research in anticipation of these motions, including research on Defendants' waiver of their rights to a Rule 50 motion based on the procedural failure to raise the issue at the close of all evidence. Plaintiff has also drafted oppositions to their anticipated motions.

70. Plaintiff will submit to the Court a final billing statement after opposing the anticipated Rule 50 and 59 motions and replying to an opposition to this motion for fees and costs.

71. From the recitation of the course of this litigation above, it is clear that TWG was also precluded from pursuing other litigation matters by accepting this case. We have represented Plaintiff for over two and a half years, during which considerable time and effort were spent on this litigation. Consequently, and because of the current size and limited time and resources of TWG, other employment opportunities had to be passed over.

## QUALIFICATIONS OF DOUGLAS H. WIGDOR

72. I am a founding partner of Thompson Wigdor & Gilly LLP ("TWG"). I have been practicing law for over ten years with a primary focus on litigation and labor and employment law. I am a member of the bars of the States of New York, Pennsylvania and the District of Columbia. I am also admitted to practice before the United States Supreme Court, the Second Circuit Court of Appeals, and the Eastern, Southern and Northern Districts of New York. I am admitted to practice law in the United Kingdom and I am a qualified solicitor in England and Wales.

73. I received an undergraduate degree in Political Science from Washington University in St. Louis and graduated *cum laude* in 1990.

74. I received a Juris Doctor from the Catholic University of America in Washington, D.C. in 1993, where I graduated at the top of my class. During law school, I was a Senior Staff Member of the *Catholic University Law Review*.

75. I received a Masters Degree in Politics from Oxford University in England in 1995. While at Oxford, I was an editor of the *Oxford International Review*.

76. I served as an Assistant District Attorney in Suffolk County, New York from 1995 to 1998, during which time I prosecuted and tried hundreds of criminal matters ranging from robberies and burglaries to complex fraud schemes. While with the D.A.'s Office, I was promoted to the Complex Litigation Bureau, where I litigated and supervised the prosecution of white-collar crime, organized crime, bank fraud, insurance fraud, tax evasion, identity theft and elder abuse cases. Due to the breadth of my experience, I was appointed under the Federal Criminal Justice Act to serve a three-year

term, in the Eastern District of New York, as a criminal defense lawyer in selected criminal cases.

77. I had the distinguished privilege to serve as a federal law clerk to United States District Judge Arthur D. Spatt from 1998 to 1999, where I was exposed to a broad range of complex civil and criminal litigation.

78. I was a senior lawyer in the labor and employment section of Morgan, Lewis & Bockius LLP ("Morgan Lewis") from 2000 through 2003. At Morgan Lewis, I litigated and tried cases on behalf of Fortune 500 clients on issues relating to a broad range of U.S. and U.K. labor and employment matters. These matters included the successful defense of one of the nation's leading defense industry contractors accused of age discrimination before a jury trial before U.S. District Judge Leonard D. Wexler.

79. Since founding TWG, I have represented management side employers, high-level employees and entry-level employees, such as Plaintiff. The vast majority of my current practice is comprised of labor and employment related litigation in both federal and state courts. I also devote a portion of my practice to criminal matters and recently, after being retained by Hollywood Video, secured the complete acquittal, after trial, of a Hollywood Video Store manager faced with a 25-count indictment and 135 years in prison.

80. I am also a frequent lecturer, editor and author of articles on employment and criminal related subjects. I am an editor of "Litigating Employment Discrimination Claims" by James Publishing 2005 and some of my publications and presentations include: *Advising Senior Management and Boards in the Public Eye: Dealing With Alleged High Profile Executive Misconduct,* American Employment Law Council

Conference; *EEOC Cases and the Second Circuit on the Reasonably Related Doctrine,* New York Law Journal (July 19, 1999).

81. I have regularly appeared in both print and television media as an expert in employment law including the New York Times, Wall Street Journal, ABC, CBS, the BBC and the London Independent.

82. I was selected as a member in both the Alexander Hamilton and Theodore Roosevelt Inns of Court wherein I work together with other selected lawyers and state and federal judges in the analysis of current legal issues.  Additionally, I am a member of the Association of the Bar of the City of New York and the Suffolk County Bar Association, where I am a member of the Labor and Employment Law and Criminal Law Committees and where I have given CLE-approved lectures on employment law.

83. The current hourly rate charged for my services is $450.00 per hour.

## QUALIFICATIONS OF SCOTT B. GILLY

84. Scott Browning Gilly is a founding partner of TWG.  Mr. Gilly has been practicing law for over twelve years with a primary focus on litigation and labor and employment law.  Mr. Gilly is a member of the bars of the States of New York, Pennsylvania, Virginia and the District of Columbia.  Mr. Gilly is also admitted to practice before the Second Circuit Court of Appeals, the Fourth Circuit Court of Appeals, the U.S. District Court for the Southern and Eastern Districts of New York, the Eastern District of Virginia and the U.S. District Court for the District of Columbia.

85. Mr. Gilly received an undergraduate degree in Psychology from Harvard University in 1990.

86. Mr. Gilly received a Juris Doctor from the Catholic University of America in Washington, D.C. in 1993, where he graduated at the top of his class. During law school, he was a published author and Editor-in-Chief of the *Catholic University Law Review*.

87. Prior to founding TWG, Mr. Gilly practiced law in both the New York and Washington, D.C. offices of Morgan Lewis from 1993 though 1999.

88. Mr. Gilly has appeared extensively in federal and state courts in single-plaintiff, multi-plaintiff and class action discrimination suits and related employment litigation involving Title VII, Pregnancy Discrimination Act, Equal Pay Act, Americans with Disabilities Act, Age Discrimination in Employment Act, Fair Labor Standards Act, Section 1981, trade secrets, restrictive covenants and employment contracts. He is highly experienced in dealing with the intricacies of these laws and the agencies that administer them. He also handles securities industry arbitration before the NASD and NYSE, as well as administrative proceedings, mediations and other alternative dispute resolution (ADR) procedures before the EEOC and other federal and state government agencies. Mr. Gilly has represented and continues to represent some of corporate America's most well-known companies.

89. Mr. Gilly has substantial experience in salary arbitration involving many of the highest profile clubs and players in Major League Baseball and the National Hockey League. He has also participated in counseling the owners of professional baseball and professional soccer franchises on the labor and antitrust issues concerning their collective bargaining relationship with players' unions and their individual player and club salary contracting practices. In addition to his legal experience representing professional sports franchises, Mr. Gilly has represented clients involved in the business of sports, as well as

individual actors, performers, models, writers, producers, directors and executives in the motion picture, television and radio and other entertainment industries.

90. Mr. Gilly frequently speaks and writes about labor and employment law issues as well as issues affecting the professional sports and entertainment industries.

91. The current hourly rate charged for Mr. Gilly's services is $450.00 per hour.

## QUALIFICATIONS OF MICHELLE M. LE ROUX

92. Michelle le Roux is an associate attorney with TWG.  Ms. le Roux has been practicing law for over six years with a primary focus on litigation and labor and employment law.  Ms. le Roux is a member of the bars of the State of New York and the Southern and Eastern Districts of New York.

93. Ms. le Roux received her undergraduate degree from the University of Cape Town in South Africa in 1995.  She received her Bachelor of Laws[4] from the University of Cape Town in 1998.

94. While at the University of Cape Town, Ms. le Roux received the Jules Kramer Class Medals for the highest grades in Alternative Dispute Resolution and Public International Law.  She also received a first place distinction in a Moot Court Competition in Constitutional Law.  While in law school she clerked for the Honorable Dennis M. Davis, an appellate judge in South Africa's highest court for labor and employment matters.

95. Ms. le Roux received a Masters of Law from New York University in 2001, focused on employment law, arbitration and international law.

---

[4] A Bachelor of Laws is the South African equivalent of a Juris Doctor.

96. Ms. le Roux interned with the State of Colorado Office of Dispute Resolution in 1999, where she focused on developing court-annexed mediation services for employment and family law disputes.

97. Ms. le Roux was an associate with the Jacob B. Fuchsberg Law Firm, LLP from 1999 through 2001 where she managed a diverse plaintiffs-side employment litigation caseload from claim investigation through discovery, trial and appellate stages, including class actions.

98. Ms. le Roux was an associate with Arenson Dittmar & Karban ("Arenson Dittmar") from 2001 through 2004, where her practice was also primarily focused on employment litigation. While at Arenson Dittmar, she was lead counsel in several arbitrations regarding discriminatory promotion and discipline claims pursuant to a class action settlement.

99. Ms. le Roux became associated with TWG in May 2004 and is the lead associate and second chair in the litigation of this matter.

100. The current hourly rate charged for Ms. le Roux's services is $300.00 per hour.

## QUALIFICATIONS OF OTHER ATTORNEYS AND STAFF

101. Other attorneys associated with TWG also performed work on this matter.

102. Kenneth P. Thompson, a founding partner of TWG, assisted with the preparation of this case for trial. Mr. Thompson, a graduate of New York University School of Law, spent his early career in public service with the Treasury Department and then as an Assistant United States Attorney who prosecuted, among other high-profile cases, the Abner Louima federal civil rights trial. Mr. Thompson was then a senior associate at

Morgan Lewis & Bockius before founding TWG in 2003. The current hourly rate for Mr. Thompson is $450.00 per hour.

103. Andrew Goodstadt took the depositions of Defendants' economic and psychological expert witnesses in the weeks before trial since the other attorneys on the case were immersed in trial preparation and drafting Plaintiff's opposition to Defendants' five motions *in limine*. Mr. Goodstadt also provided assistance on this case throughout the litigation.

104. Mr. Goodstadt is a senior associate attorney with TWG who has been practicing law for over 7 years with a primary focus on litigation and labor and employment law. Mr. Goodstadt was associated with Proskauer Rose LLP and the Law Offices of Joseph E. Bachelder, the preeminent executive compensation law firm in the country, prior to joining TWG. The current hourly rate charged for Mr. Goodstadt's services is $350.00 per hour.

105. Jeffery A. Dougherty was a junior associate with TWG who performed research assignments at the direction of Ms. le Roux and myself. Mr. Dougherty had been practicing law for over 3 years with a primary focus on litigation and labor and employment law. The hourly rate charged for Mr. Dougherty's services is $265.00 per hour.

106. James C. Mallios was an associate attorney with TWG who performed research assignments and other trial preparation in this matter. Mr. Mallios had been practicing law for over 5 years with a primary focus on litigation and labor and employment law and was associated with the firm of Liddle & Robinson prior to joining TWG. The hourly rate charged for Mr. Mallios' services is $325.00 per hour.

107.  Key Mendes worked on this matter in its early stages.  Ms. Mendes was an associate attorney with TWG who had been practicing law for over 6 years with a primary focus on litigation and labor and employment law, including working with Vladeck, Waldman, Elias & Engelhard, P.C.  The hourly rate charged for Ms. Mendes' services is $300.00 per hour.

108.  Kathryn Webber is an associate attorney with TWG who has been practicing law for over 7 years with a primary focus on litigation and employment law.  The hourly rate charged for Ms. Webber's services is $350.00 per hour.

109.  Jillian Howell is a paralegal with TWG who performed all paralegal duties associated with this matter.  Ms. Howell graduated from Kenyon College in 2003 and has assisted TWG in other trials.  The current hourly rate for Ms. Howell's services is $100.00 per hour.

By reason of the foregoing, and for all the arguments set forth in Plaintiff's papers submitted herewith, Plaintiff's Motion for Attorneys' Fees, Costs and Pre- and Post- Judgment Interest should be granted.

Declared under penalty of perjury this
27th day of June 2005

Douglas H. Wigdor (DW-9737)