**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
PATRICK S. BRADY,

                       Plaintiff,

        - against -

WAL-MART STORES, INC., et al.,

                     Defendants.
----------------------------------------------------------X

**MEMORANDUM**
**AND ORDER**
CV 03-3843 (JO)

**JAMES ORENSTEIN, Magistrate Judge:**

      Plaintiff Patrick S. Brady ("Brady") filed this discrimination action against his former

employer, Wal-Mart Stores, Inc. ("Wal-Mart"), and two of their managers, Yem Hung Chin

("Chin") and James Bowen ("Bowen") alleging violations of the Americans with Disabilities Act

("ADA"), 29 U.S.C. § 12101, *et seq*. and the New York Human Rights Law ("NYHRL"), N.Y.

Exec. Law § 290, *et seq*. Docket Entry ("DE") 33 (Amended Complaint). Following a trial, and

on the basis of the jury's verdict, I directed the Clerk to enter judgment in favor of Brady jointly

and severally against Wal-Mart and Chin in the amount of $2,500,000 and against Wal-Mart

alone in the additional amount of $300,002. *See* DE 111. The jury did not find Bowen

personally liable on any of Brady's claims, and I therefore dismissed with prejudice the charges

against him. Wal-Mart and Chin now seek judgment in their favor as a matter of law pursuant to

Federal Rule of Civil Procedure ("Rule") 50(b) as well as a new trial, or in the alternative for

remittitur of compensatory damages, pursuant to Rule 59(a). Brady also seeks relief in the form

of an application for costs, including attorneys' fees, pursuant to Rule 54(d). For the reasons set

forth below, I now deny the Rule 50(b) motion, deny the Rule 59(a) motion provided Brady

agrees to remittitur in the amount of $600,000 in compensatory damages, and award Brady

$644,145.22 in costs including reasonable attorneys' fees.

I.    <u>Background</u>

On August 6, 2003, Brady filed a complaint against Wal-Mart, Chin, and Bowen alleging several claims arising from his experience applying for, and subsequent employment in, the position of a part-time sales associate at the Wal-Mart store in Centereach, New York during the summer of 2002.  Brady suffers from cerebral palsy, and all of his claims are related to his contention that Wal-Mart and its employees discriminated against him because he is disabled.

Specifically, Brady alleged that Wal-Mart violated the ADA during the application process by asking him prohibited questions before making a conditional offer of employment. He also contended that after he accepted Wal-Mart's offer to work in their pharmacy, the defendants further discriminated against him by subjecting him to two adverse employment actions:  first by transferring him from his position as a sales associate in the pharmacy to an assignment collecting shopping carts in the store's parking lot, and then, after Brady protested the first transfer, by transferring him again to the store's food department and putting him on a work schedule that required him to work during hours in which, as he had previously informed Wal-Mart, he was unavailable.  Brady complained of each transfer as a discriminatory act, and also alleged that Wal-Mart had subjected him to a hostile work environment and then constructively discharged him on the basis of his disability.  Finally, Brady claimed that Wal-Mart failed to provide a reasonable accommodation for his disability and accused Chin and Bowen of participating in the conduct giving rise to his claims.  The defendants denied engaging in any such discrimination, denied that Brady is disabled within the meaning of the pertinent federal statute, and denied that they believed or had reason to believe that Brady was disabled during the events in issue.

On February 14, 2005 the Honorable Leonard D. Wexler, United States District Judge, selected a jury to consider the case. Following that proceeding, all of the parties consented to the referral of this case to a magistrate judge for all purposes, including the entry of judgment, pursuant to 28 U.S.C. § 636(c)(1) and Rule 73. DE 66. I then presided over the jury trial, which began on February 16, 2005, and concluded on February 23, 2005, when the jury returned its verdicts.

Several of the verdicts favored Brady. The jury found that Wal-Mart discriminated against Brady by subjecting him, on the basis of his disability, to one specific adverse employment action (the transfer from the pharmacy to the parking lot) and in general to a hostile work environment. The jury further found that Chin participated in these violations. In addition, the jury found that Wal-Mart failed to meet its obligation of offering Brady a reasonable accommodation. Finally, the jury found that Wal-Mart had violated the ADA with respect to one of the two pre-employment inquiries about which Brady complained; specifically, it found that a question on a form describing the job requirements of the position to which Brady had applied was unlawfully asked prior to Wal-Mart's conditional offer of employment. *See generally* DE 80 (Verdict Sheet) at 1-3. I directed the jury to make the latter finding based on my legal ruling that the inquiry would violate the ADA if made prior to the conditional job offer and on the parties' agreement that the record required the jury to find that timing element satisfied. *See* Transcript of Trial ("Tr.") 986-88.

Although Brady prevailed on much of his complaint, the jury also made a number of findings that favored some or all of the defendants. The jury decided that Brady had failed to prove that Bowen participated in Wal-Mart's discrimination. It also found that Brady had failed

to prove that Wal-Mart's pre-employment questioning about Brady's use of prescription medications was prohibited. The jury also did not find that transferring Brady from the parking lot to the food department was an adverse employment action, that Brady was constructively discharged, or that any of the defendants intentionally inflicted emotional distress upon Brady. *See generally* Verdict Sheet, at 2-4.

In assessing damages on the claims that it found Brady did prove, the jury awarded a total of $5,000,000 in punitive damages, $2,500,000 in compensatory damages for emotional pain and suffering, $9,114 for damages related to lost back pay, and nominal damages of one dollar apiece on the reasonable accommodation and job application process claims. *See id.* at 4, 6. On the basis of Wal-Mart's post-trial motion, I reduced the total award of punitive damages to $300,000 pursuant to 42 U.S.C. § 1981a and, with the parties' consent, allocated all of the $2,500,000 compensatory damage award to Brady's state law claims under the NYHRL. DE 111 at 9. I struck the jury's award of $9,114 for lost back pay because Brady did not prevail on his constructive termination claim. *Id.* at 10.

II. The Defendants' Rule 50 Motion

The defendants argue that they are entitled to judgment in their favor as a matter of law, notwithstanding the jury's verdicts, on a variety of grounds. First, they contend that although Brady was disabled within the meaning of the relevant state law, he did not fall within the ADA's definition of that term. Second, they assert that Wal-Mart's decision to transfer Brady from the pharmacy to the parking lot cannot be deemed to have been an adverse employment action. Third, they argue that the evidence before the jury was insufficient to support the verdict that Brady was subjected to a hostile work environment. Fourth, Wal-Mart claims that even if Brady

was disabled, it was under no obligation to offer him any reasonable accommodation for his disability. Fifth, Wal-Mart denies that the ADA prohibited it from inquiring of Brady, before making him a conditional offer of employment, as to whether he could perform the job with or without a reasonable accommodation. Sixth, the defendants maintain that the evidence did not suffice to allow the jury to award punitive damages. *See* DE 120 at 3-4; *see also* DE 121 ("Rule 50 Memo.") at i.

To prevail on their motion for judgment as a matter of law as to any of the issues listed above, the defendants must show that "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Rule 50(a)(1). In deciding the motion, I "may consider all the record evidence, but in doing so ... must draw all reasonable inferences in favor of the non-moving party, and ... may not make credibility determinations or weigh the evidence." *Cross v. New York City Transp. Auth.*, 417 F.3d 241, 247 (2d Cir. 2005) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (internal quotation marks omitted). Where, as here, a jury has deliberated and returned a verdict, the standard is high: there must be either "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Cross*, 417 F.3d at 248 (citing *Song v. Ives Labs.*, 957 F.2d 1041, 1046 (2d Cir. 1992)) (internal quotation marks omitted). After addressing some threshold issues, I explain why, in my view, the defendants have failed to meet that heavy burden in any respect.

A.     Preliminary Matters

As a threshold matter, Brady asserts that the defendants waived their Rule 50 motion by failing to renew it at the close of all the evidence.  DE 130 ("Rule 50 Opp.") at 1.  His procedural argument ignores the reality that the defendants made every appropriate effort to do so, and that the existence of any question in this regard is due entirely to my own improvident efforts to achieve efficiency.  As a result, the pertinent law does not foreclose the defendants' renewal of the request for relief after a verdict pursuant to Rule 50(b).

There is no dispute that the defendants properly sought judgment as a matter of law at the close of plaintiff's case.  Indeed, they did so in great detail.  *See* Tr. 472-511.  The issue arises because of the way I conducted the proceedings on the last day of testimony.  Before the start of that day's proceedings, I had already conducted a lengthy charge conference with the parties during the preceding holiday weekend. *See* DE 105 (transcript of charge conference dated Feb. 21, 2005) ("Charge Tr.").  At that conference, I had explicitly discussed the "renewed rule 50 application" with the parties, and it was clear to all that such a motion would be made.  *See* Charge Tr. 68.  When the trial reconvened the next day, which all concerned anticipated would be the final day of testimony, *see* Charge Tr. 159-60, I gathered the attorneys in chambers before the jury's arrival to address a variety of issues.  After discussing some matters, including supplemental requests to charge the jury, I asked the attorneys if there were "[a]ny other housekeeping" matters to which I should attend.  Tr. 746.  Counsel for the defendants then initiated the following colloquy:

> Mr. Finger:     I would like to renew the other matters that I raised under [Rule 50(a)].  I assume you don't need me to raise them in any kind of detail.

> The Court: No. Your [50(a)] motion is denied without prejudice to renewing it, if appropriate, *after the verdict*.

Tr. 747 (emphasis added). Following that colloquy, the parties presented brief testimony, and then proceeded to make their final arguments. There was no further discussion of a renewed motion under Rule 50.

I plainly erred in handling the matter when the defendants' counsel raised it at the start of the final day of trial. In retrospect, it is obvious that the attorney wished only to alert me that he would later renew his motion, but I incorrectly treated his statement as the motion itself. In denying that motion, I explicitly stated that the motion could again be renewed, "if appropriate, after the verdict." *Id*. I followed that statement with an observation that I wished to "get the jury in and move on." Tr. 749.

To the extent that the defendants' counsel did not once again ask me to enter judgment pursuant to Rule 50 during the very brief interval between the end of rebuttal testimony, Tr. 834, and the jury's return to hear final arguments, Tr. 835, the lapse was mine and not counsel's. Far from waiving the motion, the defendants' counsel raised it at virtually every opportunity, only to have me reject it without prejudice to later renewal. *See* Tr. 508, 744, 747; Charge Tr. 68-72. In response to the last such effort, I (erroneously) made it clear that I would not consider the motion again before the entry of a verdict. Tr. 747. There can be no question that the defendants' counsel made a more-than-reasonable effort to call my attention to the bases for the motion it now seeks to renew and did nothing to mislead Brady into holding back any rebuttal evidence. *See Best Brands Beverage, Inc. v. Falstaff Brewing Corp.*, 842 F.2d 578, 587 & n.3 (2d Cir.

1987). The defendants have thus managed to preserve their right to make the instant motion notwithstanding my own error that needlessly muddied the record in that regard.

As a separate preliminary matter, the defendants have moved to strike the affirmation of Brady's lead counsel, DE 129 ("Wigdor Rule 50 Aff."), on the ground that it is not based on personal knowledge and constitutes an attempt to present argument that would otherwise be foreclosed by the page limitations on Brady's memorandum of law. DE 146. Because I have resolved the Rule 50 motion without consideration of the challenged affidavit, I deny the application as moot.

     B.    <u>Evidence Of Disability</u>

The defendants do not contest that Brady is afflicted with cerebral palsy, *see* Charge Tr. 48-52, but they do vigorously deny that he is "disabled" within the meaning of the ADA because, in their view, there was no evidence demonstrating that his medical condition substantially limited him in any major life activity. Rule 50 Memo. at 4. They further contend that they also did not "regard" Brady as disabled because he never mentioned his condition to Chin or anyone else at Wal-Mart and because his obvious limp was not sufficient to have caused them to infer that he was limited in any major life activity. *Id.* at 7. Brady disagrees on both counts – he contends that there was ample evidence to support a jury finding both that he was disabled for purposes of the federal statute and that Wal-Mart viewed him as such, notwithstanding the care with which its witnesses avoided using the word "disabled" in their testimony. Rule 50 Opp. at 9, 12.[1]

---

[1] This issue affects the validity of the punitive damages award against Wal-Mart on the ADA claim, but not the compensatory damages award against both defendants under the corresponding state claim. The parties agreed that Brady was disabled for purposes of the NYHRL.

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). The first and third prongs of that definition are at issue here.

Determining whether an individual is disabled under subsection (2)(A) requires a three-step inquiry. *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998) (citing *Bragdon v. Abbott*, 524 U.S. 624, 631-32 (1998)). First, the court must determine whether the individual suffers from a physical or mental impairment. *Id*. Second, it must determine "whether the life activity on which the individual relies amounts to a major life activity." *Bartlett v. N.Y. State Board of Law Examiners*, 226 F.3d 69, 79 (2d Cir. 1998) (citing *Bragdon*, 524 U.S. at 631) (internal quotation marks omitted). Third, the court must determine whether the individual's impairment *substantially limits* the major life activity previously identified. *Id*.

There is no dispute that Brady has met the first two requirements of the preceding definition. The defendants concede both that Brady had an impairment and that it affected a number of major life activities; the focus of the dispute is thus their contention that the evidence did not suffice to demonstrate that Brady's impairment substantially limited him with respect to an identified major life activity. *See* Rule 50 Memo. at 4-7.

In trying to define the contours of both "major life activity" and "substantial limitation," courts have looked for non-binding guidance to the regulations of the Equal Employment Opportunity Commission ("EEOC"). *See Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998). Those regulations define major life activities as "functions such as caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

*Id*. (stating that this list is illustrative and not limited to the enumerated activities) (citing 29

C.F.R. § 1630.2(i)).  They further define "substantially limits" as being "[u]nable to perform a

major life activity that the average person in the population can perform; or [as being]

[s]ignificantly restricted as to the condition, manner or duration under which an individual can

perform a particular major life activity as compared to the condition, manner, or duration under

which the average person in the general population can perform that same major life activity."

*Id*. (citing 29 C.F.R. § 1630.2(j)(1)).  The regulations go on to advise that "[t]he nature and

severity of the impairment[,] [t]he duration or expected duration of the impairment[,] and [t]he

permanent or long term impact of or resulting from the impairment" should all be taken into

consideration in determining whether an impairment substantially limits a major life activity.  *Id*.

(citing 29 C.F.R. § 1630.2(j)(2)).  Finally, in addition to taking guidance from the EEOC

regulations, courts have also recognized that the burden of demonstrating disability within the

meaning of the ADA "is not necessarily an onerous one, and in fact, certain limitations will

'ordinarily' qualify as disabilities[.]"  *Bartlett*, 226 F.3d at 80 (discussing the difficulty in

demonstrating substantial limitation the court stated that) (citing *Albertson's, Inc. v. Kirkingburg*,

527 U.S. 555, 564-65 (1999)).  I therefore examine the record to ensure that the jury had enough

to conclude that Brady was disabled, without setting the bar higher than Congress intended.

    Brady testified that his cerebral palsy

    affects the way I work and run.  I have a limp that is very noticeable.  It affects my
    speech.  I speak slowly than people my own age [sic].  It affects my vision and my
    balance.  I have had four separate operations on my eyes .... and three separate
    operations on my legs and feet.  I had to use leg braces, hip braces, supports,
    orthotics.

Tr. 110.[2]  It also limited his ability to read:  Brady testified that he "had extended time to pass the

school [sic].  And I got my test read to me."  Tr. 111.  Brady's mother similarly testified that

while attending college "[h]e was allowed extra time to take his tests.  He took them at a special

services [sic]; he didn't take them at a classroom with the rest of his class.  He was also allowed

to tape his lectures."  Tr. 351.

The evidence also showed that cerebral palsy took its toll on Brady's ability to work.  His

father testified that Brady "gets tired easily.... [h]e works slower.  He has a tendency to ... trip or

drag his feet."  Tr. 328-29.  Brady himself testified that his ability to drive was limited, that he

"basically drove only local distances, because [he] really [doesn't] have a good sense of

direction."  Tr. 111.

Based on this evidence, and drawing all reasonable inferences in Brady's favor as required

under Rule 50, I conclude that the jury could have easily found that Brady's impairment –

cerebral palsy – substantially limits his ability to learn, walk, drive, and generally perform most

of the functions commonly taken for granted in ordinary life.  The jury could have found that

Brady's condition is permanent and will not get better in the future or periodically subside to

_____

[2]  Although not necessary to my decision, I note that the jury was in a position directly to assess
Brady's testimony in this regard.  Brady's gait and difficulty in speaking, neither of which can be
conveyed by a transcript, would easily have allowed the jury to infer the facts to which Brady had
attested.  *See Rubert-Torres v. Hospital San Pablo, Inc.*, 205 F.3d 472 (1st Cir. 2000) (in medical
malpractice case arising from plaintiff's daughter's cerebral palsy, it was error to preclude jury
from getting first-hand view of daughter's appearance, and restricting evidence to descriptions
provided by experts) (citing *Rich v. Ellerman & Bucknall S.S. Co.*, 278 F.2d 704, 708 (2d Cir.
1960) ("Autoptic preference is always proper, unless reasons of policy apply to exclude it.")).
The jury's first-hand assessment of Brady's appearance could also have helped them to make a
credibility determination regarding the testimony of Wal-Mart employees who worked alongside
Brady and who insisted, with remarkable unanimity, that it never occurred to them that he might
be disabled.  *See, e.g.*, Tr. 613-14 (Bowen); Tr. 541-42, 564-65 (Chin); Tr. 734 (Kelly Collins);
Tr. 681-82 (Theodore Wicks).

afford him temporary reprieve. *See Ryan*, 135 F.3d at 871 (finding that an impairment that became asymptomatic for long periods of time counseled against finding substantial limitation). The record also sufficed to allow the jury to find Brady permanently and substantially limited with respect to reading, *see* Tr. 111, 292, 351-52, which has been held to be a major life activity. *See Bartlett,* 226 F.3d at 80.

Specifically with respect to Brady's ability to work, the jury could easily have found that the mobility problems to which Brady and others testified – with respect to both walking and driving – amounted to a substantial limitation because they curtail the "geographical area" in which Brady can seek employment. *See* 29 C.F.R. § 1630.2(j)(3)(ii)(A). Such a finding would support a conclusion that Brady's impairment precludes him from a "broad range of jobs" compared to others who can easily commute to a job that is farther away. *See Colwell*, 158 F.3d at 643 (quoting 29 C.F.R. § 1630.2(j)(3)(i)).

The evidence was more than sufficient to support the jury's finding that Brady is disabled as defined in the first prong of the ADA definition; I therefore need not analyze in detail whether the record would also have supported a jury finding under the third prong that Wal-Mart "regarded" Brady as disabled, although I conclude that the proof was likewise sufficient.[3] I am therefore satisfied that the jury's finding that Brady was within the class of persons protected by the ADA was in no way the "result of sheer surmise and conjecture," *Cross*, 417 F.3d at 248

---

[3] *See*, *e.g.*, Tr. 178 (Brady's testimony that "Mr. Bowen told me that he spoke to Ms. Chin, and Ms. Chin said that I wasn't fit for the pharmacy job" and that Bowen specifically used the word, "fit"). Although Bowen's testimony and Chin's disagreed with Brady's in this regard, the jury could have resolved the disagreement in Brady's favor and inferred from the proof that Chin viewed Brady as disabled.

(quoting *Song v. Ives Labs.*, 957 F.2d 1041, 1046 (2d Cir. 1992), and I therefore deny the corresponding portion of Wal-Mart's motion.

      C.      <u>The Transfer To The Parking Lot</u>

The defendants next seek to negate the jury's verdicts on both the federal and state disability claims on the ground that the evidence failed to establish that Wal-Mart's transfer of Brady from the pharmacy to the cart-pushing position in the parking lot constituted an adverse employment action. Rule 50 Memo. at 12. Specifically, Wal-Mart contends that the transfer could not be considered a "setback" to Brady's career because the action was temporary, and that it also could not be considered a "demotion" because Brady did not offer any evidence "to refute that the transfer was a lateral move." *Id*. at 13, 16. Brady argues that his transfer to the parking lot constituted an adverse employment action because it negatively affected the terms and conditions of his employment. Brady contends that the transfer was to a less prestigious position, that the place he was to perform his duties changed from indoors to outdoors, that the opportunity for advancement was materially different, and that at the time of the transfer he understood it to be permanent. Rule 50 Opp. at 18-21.

A plaintiff suffers an adverse employment action

> if he or she endures a materially adverse change in the terms and conditions of employment. To be materially adverse a change in working conditions must be more disruptive than a mere inconvenience or an alternation of job responsibilities [and it may] be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation.

*Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations and internal quotation marks omitted).

A lateral transfer, or a change of employment that does not involve a demotion "in form or substance" does not constitute an adverse employment action. *See Leget v. Henderson*, 2001 WL 43615, at *5 (S.D.N.Y. Jan. 18, 2001) (finding transfer was not an adverse employment action because "temporary" transfer did not involve a loss of salary, benefits, responsibility or title). However, a lateral transfer that does not result in a loss of benefits or money may nonetheless constitute an adverse employment action "so long as the transfer alters the terms and conditions of the plaintiff's employment in a materially negative way." *Patrolmen's Benevolent Ass'n of the City of New York v. City of New York.*, 310 F.3d 43, 51 (2d Cir. 2002); *see also de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Servs.*, 82 F.3d 16, 21 (2d Cir. 1996) (finding transfer to a "less prestigious" department with less opportunity for advancement constituted an adverse action).

Regardless of whether a transfer can be considered lateral rather than a demotion, an employment action may not be sufficiently adverse to support a cause of action if is "not a final employment decision, but an 'interlocutory or mediate decision.'" *Almonte v. Coca-Cola Bottling Co. of N.Y., Inc.*, 959 F. Supp. 569, 572 (D. Conn. 1997) (citing *Raley v. Bd. of St. Mary's Country Comm'rs*, 752 F. Supp. 1272, 1278 (D. Md. 1990) (quoting *Page v. Bolger*, 645 F.2d 227, 233 (4th Cir. 1981))). In *Page*, the court reasoned that Title VII contemplates discrimination on what can be characterized as "ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." 645 F.2d at 233. "Mediate" actions, therefore, even if constituting an adverse employment action, may not lead to legally cognizable harm if by some subsequent action on the part of the employer, the employee is restored to his or her previous status. *See Leget*, 2001 WL 43615, at *6 (stating that a temporary adverse transfer

followed by a complete restoration of employment status may not be actionable). For example, in *Lumhoo v. Home Depot*, 229 F. Supp.2d 121 (E.D.N.Y. 2002) the court found that an employee who was wrongfully terminated (and who remained unemployed for three weeks) but was subsequently reinstated to his former job with full back pay, benefits, seniority status, and all references to the discharge removed from his file, did not experience an adverse employment action. *Id.* at 139.[4]

The evidence before the jury included testimony about differences between Brady's work in the pharmacy department and in the parking lot, both with respect to location (indoors for one, outdoors for the other), the prospects for advancement, and the relative prestige of each. The jury also had before it evidence of the brief time that Brady spent pushing carts before, as the result of complaints, he was transferred again to the food department, and of Wal-Mart's official position that all entry-level jobs are equal. *See* Tr. 176-77, 800-03. Against that evidentiary backdrop, I cannot say that the jury had to rely on conjecture to resolve against Wal-Mart the question whether Brady's first transfer was adverse.

---

[4] I analyze Wal-Mart's motion under the law as stated in *Galabya* and its progeny; that analysis does not change as a result of the more recent decisions in *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (2006), and *Kessler v. Westchester County Dep't of Soc. Servs.*, 2006 WL 2424705 (2d Cir. Aug. 23, 2006). Both of the latter cases involved claims of retaliation rather than discrimination; and the results in each to some extent turned on the wording of relevant retaliation provisions cases that have no analog here. Neither decision appears to undermine the reasoning of *Galabya*, which served as the basis for my instruction to the jury. Thus, this case turns on whether Wal-Mart can sustain the heavy burden of showing that there were no facts in evidence on which a rational jury could find that the *Galabya* standard was satisfied. Indeed, although I do not rely on *White*, it appears to be harmonious with the result here, to the extent the court in that case concluded that the temporary nature of the action does not render it immune from being characterized as adverse. Such a conclusion is not obvious, given the references to "materially significant disadvantage" and "career advancement" in *Galabya*, but it is also not necessary to my decision.

Wal-Mart's argument that the transfer cannot be considered adverse because it was temporary has no support in the law or in the record. Brady's transfer to the parking lot was not a "mediate action" as was the plaintiff's termination in *Lumhoo*: Brady was not returned from the parking lot to his former position in the pharmacy, and there was no evidence at all, as there was in Lumhoo's case, that all references to the action of which Brady complained were removed from his employment file. Instead, after Brady was transferred to the parking lot from the pharmacy – where he had relevant experience – he was transferred to a position in a different department for which he had no relevant experience and received no training. Moreover, upon transferring Brady to the food department, Wal-Mart assigned him a work schedule that was incompatible with the hours Brady had previously said he was available. *See* Tr. 178-80. The jury could therefore easily have found, on the basis of the evidence before it, that the transfer was not temporary, despite Wal-Mart's argument about the short duration of Brady's tenure in the parking lot, and that it was therefore an adverse employment action.

Wal-Mart argues that Brady "presented no evidence to *refute* that the transfer [from the pharmacy] was a lateral move and not a demotion, and therefore not an adverse action." Rule 50 Memo. at 16 (emphasis added). For the reasons explained above, I conclude that the evidence in the record sufficed for a jury to conclude that Brady met his burden in establishing that the transfer to the parking lot was adverse within the meaning of *Galabya*. To the extent that Wal-Mart suggests that the law required Brady to do something more to refute an argument it made to the jury on the basis of the evidence, I disagree. Brady had only to establish the existence of an adverse employment action. *See Islamic Soc. of Fire Dep't Pers. v. City of New York*, 205 F. Supp.2d 75, 82 (E.D.N.Y. 2002). He was not required to do more.

D.    Hostile Work Environment

Wal-Mart contends that the evidence did not suffice to support the jury's finding of a hostile work environment.  The matter is moot:  in seeking to prove his discrimination claim, Brady bore the burden of establishing either a specific adverse employment action or a hostile work environment.  The jury found, on the basis of sufficient evidence, that Brady proved the former; as a result, even a legal finding that the evidence did not suffice with respect to the hostile environment claim would not undermine the outcome.  I therefore need not and do not pass on this aspect of Wal-Mart's motion.

E.    Reasonable Accommodation

A covered employer is liable under the ADA if it fails to "mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C.A. § 12112(b)(5)(A).  The jury found that Wal-Mart failed to make such a reasonable accommodation.

Wal-Mart argues that it is entitled to judgment as a matter of law on Brady's claim under the ADA that the company failed reasonably to accommodate his disability.  Rule 50 Memo. at 22.[5]  The company makes two distinct categories of arguments.  First, it asserts that this court never had jurisdiction over the claim because Brady did not first raise it with the EEOC before filing his complaint in federal court.  Second, it asserts it cannot be held to account for such a

_____

[5]  In raising this issue, Wal-Mart summarily reiterates its contention that Brady was not in any event disabled within the meaning of the ADA.  Rule 50 Memo. at 22.  I disagree for the reasons discussed above.

claim under the circumstances of this case because, as is undisputed, Brady never initiated an interactive process to seek a reasonable accommodation; in Wal-Mart's view, the circumstances did not create a duty on the company's part to initiate such process. *Id*. at 25. Moreover, even if it had a duty to initiate the interactive process, Wal-Mart contends that its failure to do so must be excused as a matter of law because the record is clear that Brady did not believe he needed any reasonable accommodation for his disability. *Id*. I address each in turn; as explained below, I find neither of these arguments persuasive. As a result, I deny this prong of Wal-Mart's motion and therefore preserve the jury's award of one dollar in nominal damages on the corresponding portion of Brady's complaint.

      1.   <u>Jurisdiction</u>

Before Brady could sue Wal-Mart in federal court for violations of the ADA, he was required to exhaust his administrative remedies by filing a complaint with the EEOC and obtaining a 'right-to-sue' letter. *See Shah v. New York State Dep't of Civil Serv.,* 168 F.3d 610, 613 (2d Cir. 1999). As a general matter, once the right-to-sue letter has issued, the federal court may exercise jurisdiction over the complaint, but only as to issues that the plaintiff raised in his complaint to the EEOC. *Id*. Nevertheless, a plaintiff may include additional claims in his district court complaint "if they are 'reasonably related' to those that were filed with the agency." *Id*. at 614.

Brady contends that his reasonable accommodation claim is permitted under the latter rule. In assessing such an argument, a court will "look not merely to the four corners of the often inarticulately framed charge, but take into account the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Gomes v. Avco Corp.*,

964 F.2d 1330, 1334 (2d Cir. 1992) (internal quotation marks omitted); *see also Miller v. Int'l Tel. and Tel. Corp.*, 755 F.2d 20, 23-24 (2d Cir. 1985); *Holtz v. Rockefeller & Co., Inc*., 258 F.3d 62, 82-83 (2d Cir. 2001).

When Brady complained to the EEOC, he outlined in detail the essential facts of his employment at Wal-Mart. *See* Rule 50 Memo., App. 1 ("EEOC Charge"). Those factual allegations are the same ones upon which Brady relied to establish his reasonable accommodation claim. However, as Wal-Mart notes, Brady did not specifically complain to the EEOC that he was denied a reasonable accommodation; in fact, he affirmatively told the agency that he "was fully qualified to perform the job, with or without reasonable accommodation." EEOC Charge ¶ 4.

That latter assertion is not inconsistent with Brady's reasonable accommodation claim. The crux of Brady's complaint is that although he believed himself to be fully capable of performing his duties in the pharmacy without assistance, Wal-Mart assumed that he could not do so by reason of his disability and then transferred him out of that department on the basis of its assumption without giving him an opportunity to meet its concerns through resort to a reasonable accommodation. Under these circumstances, the reasonable accommodation theory that Brady pursued in this court is sufficiently related to the complaint he raised with the EEOC. *See Gomes,* 964 F.2d at 1334; *Holtz*, 258 F.3d at 82.

The cases on which Wal-Mart relies for the proposition that "claims of failure to accommodate are not reasonably related to claims of discriminatory termination or transfer," Rule 50 Memo. at 23, are easily distinguishable. First, in *Green v. Nat'l Steel Corp*., 197 F.3d 894 (7th Cir. 1997), the defendant company claimed to have fired the plaintiff, after a well-

19

documented investigation, on the ground that she had tampered with her employment records so as to make herself appear eligible for better vacation and retirement benefits than she was actually entitled.  *Id*. at 896.  Green initially fought that action by resort to a union grievance procedure in which she included no claim of disability discrimination.  *Id*. at 897.  She did not prevail, and the union declined to take the case to arbitration.  At that point, Green filed a charge with the EEOC in which she claimed to have been fired on the basis of her disability.  *Id*.  Only after the agency issued a right-to-sue letter did Green, for the first time in her federal court complaint, allege that her employer had failed to provide a reasonable accommodation for her disability by not providing her a "suitable desk chair" or "the appropriate dimmer lighting" she required, and by not allowing her to continue parking in the handicapped parking spaces.  *Id*. at 898.  Under those circumstances, the appellate court upheld the order granting summary judgment in favor of the employer because it could not "understand how [Green] could expect her claim that she suffered from inadequate working conditions would develop from the investigation of the reasons for her discharge" – *i.e.*, her alleged tampering with the company's files.  *Id*.

The plaintiff in *Green* did not present facts to the EEOC that would lead it to realize that one of the legal labels that could be placed on her complaint was a failure to provide a reasonable accommodation.  In contrast, Brady's reasonable accommodation claim is based on the same facts that he included in his EEOC charge.  For example, Brady complained to the EEOC that Wal-Mart's "head pharmacist had said that [he] was not 'fit for the job'" and that she agreed to put Brady back in the pharmacy, but warned that the company would be "responsible if we get sued because he gives customers the wrong prescriptions."  EEOC Charge ¶ 12.  Brady also included

in his complaint to the EEOC a charge that that Wal-Mart discriminated against him because it "perceived" him as disabled. *Id*. at ¶ 15. Those allegations are plainly related to the theory on which Brady predicated his reasonable accommodation claim.

The other case on which Wal-Mart relies in this regard is *Chatoff v. West Publ'g Co*., 948 F. Supp. 176 (E.D.N.Y. 1996). Chatoff claimed that he was not promoted because he was deaf and that the "only qualitative difference between himself and those promoted over him ... was the ability to use the telephone." *Id*. at 178. He first complained to the relevant regulatory agency (which in that case was the Office of Federal Contract Compliance Programs, rather than the EEOC) that his employer had not promoted any disabled individuals in violation of a contract requiring it to promote qualified disabled persons; his complaint did not mention any failure to accommodate. *Id*. The agency investigated the matter and found that Chatoff had "not been successful" on some work projects and "was not qualified" for a specific promotion." *Id*. The Department of Labor reviewed the agency decision and upheld it. When Chatoff later sought to include a reasonable accommodation claim in his federal court complaint, the court dismissed it on the ground that "conclusory or vague allegations before an administrative agency may not predicate widely disparate claims brought subsequently before federal courts[.]" *Id.* at 179.

Like the plaintiff in *Green*, Chatoff not only switched legal theories in pursuing a reasonable accommodation claim, he also necessarily relied on facts that the administrative agency had no occasion to investigate. Not so with Brady: although he did not specifically ask the EEOC to grant him relief on the basis of a reasonable accommodation theory, he did present the factual allegations upon which he now relies to support such a theory. I find that this court has jurisdiction over the reasonable accommodation claim.

2.      The Interactive Process

Under the ADA's regulatory scheme, employers and employees are supposed to engage in an "interactive process" to determine whether it is feasible to provide an accommodation for an employee's disability.  *See Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000).  In general, "the initial burden of requesting an accommodation is on the employee and it is only after such a request has been made that the employer must engage in the 'interactive process' of finding a suitable accommodation."  *Felix v. New York City Transit Auth.*, 154 F. Supp.2d 640, 656-57 (S.D.N.Y. 2001); *see also* 29 C.F.R. pt. 1630 App. § 1630.9 (stating that "it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed").

The purpose of the notice requirement, and of requiring the disabled employee to initiate the interactive process, is to protect an employer from a claim of discrimination by an employee whom it did not know to be hampered by a disability.  *Felix*, 154 F. Supp.2d at 657.  That rationale disappears, however – and with it, the employee's exclusive responsibility to initiate the interactive process – "where the disability is obvious or otherwise known to the employer without notice from the employee."  *Id*.  Thus, where "an employer has independent knowledge of an employee's disability," *id*., "it may be necessary for the covered entity [*i.e.*, the employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation."  29 C.F.R. § 1630.2(o)(3).

Wal-Mart argues that its failure to engage in the interactive process, without more, cannot support a finding of liability.  *See* Rule 50 Memo. at 25 (citing *EEOC v. Yellow Freight Sys.*, 2002 WL 31011859, at *24 (S.D.N.Y. Sept. 9, 2002)).  The statement is accurate as far as it goes,

but inapposite precisely because Brady does not rely on the absence of an interactive process alone.  Rather, he relies on the presence of an additional fact that warrants an exception to the general rule:  Wal-Mart's knowledge of his disability, which he believes he proved by a preponderance of the evidence.  To be sure, Wal-Mart presented testimony that Chin did not think that Brady had cerebral palsy, Tr. 541; if it credited that testimony, the jury might well have rejected Brady's reasonable accommodation claim on the ground that Wal-Mart had no knowledge of Brady's disability and therefore no duty to initiate the interactive process.  On the other hand, the jury also heard evidence that Chin thought Brady was unable to perform his duties in the pharmacy to an extent greater than she had ever encountered before.  Tr. 597.  To the extent the jury believed not only that Brady was disabled but that he appeared so to Chin, notwithstanding her denial, it could rationally have concluded that there was a factual predicate for Wal-Mart to have the responsibility to initiate the interactive process to explore the possibility of a reasonable accommodation before relegating Brady to the parking lot.

Finally, I reject Wal-Mart's argument that any interactive process would have been futile because Brady did not believe he needed an accommodation.  The record shows no more than that Brady did not believe he needed an accommodation up to the point where Wal-Mart made a unilateral decision to remove him from the pharmacy.  It would be pure speculation to assume that he would have taken the same position if Wal-Mart had expressed a concern to him that his disability rendered him less successful in the pharmacy than the company required him to be and had discussed ways to remedy the problem that it alone perceived.

F.    The Pre-Employment Inquiry

There is no dispute that before it made a conditional offer of employment to Brady, Wal-Mart provided him with a description of the job for which he had applied and asked whether he could perform all of the essential functions it listed with or without a reasonable accommodation. Wal-Mart contends that its inquiry was permissible, and that it is therefore entitled to judgment in its favor on the cause of action based on that inquiry. Rule 50 Memo. at 29-32. Brady disagrees on the ground that the inquiry was overbroad and therefore "likely to elicit information revealing an applicant's disability," in violation of the ADA. Rule 50 Opp. at 29. As explained below, I adhere to the ruling I made at the trial; as a result, I deny this prong of Wal-Mart's motion and therefore preserve the jury's award of one dollar in nominal damages on the corresponding portion of Brady's complaint.

To protect disabled job applicants from being unfairly judged on the basis of a disability, the EEOC regulates the questions an employer may ask before extending a conditional job offer, as well as the standards by which such an employer may determine a candidate's qualifications. One of the regulations pertinent to the instant dispute explicitly permits an employer, prior to making a job offer, to inquire "into the ability of an applicant to perform job-related functions[.]" 29 C.F.R. § 1630.14(a) (cited in Rule 50 Memo. at 29). However, as a general matter,

> It is unlawful for a covered entity to use qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities, on the basis of disability, unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity.

29 C.F.R. § 1630.10. The EEOC has explained that this regulation is meant

24

to ensure that there is a fit between job criteria and an applicant's (or employee's) actual ability to do the job. Accordingly, job criteria that even unintentionally screen out, or tend to screen out, an individual with a disability or a class of individuals with a disability because of their disability may not be used unless the employer demonstrates that the criteria, as used by the employer, are job-related to the position to which they are being applied and are consistent with business necessity.

29 C.F.R. Pt. 1630, App. § 1630.10.

The crux of the dispute on this point is thus whether Wal-Mart's inquiry of Brady asked about his ability to perform functions that were actually related to the job for which he was applying. And at the heart of that question is whether the following "essential function" that Wal-Mart listed in the job description it provided to Brady was indeed something he might be expected to do in the job for which he was applying: "Frequently pick up, lift, carry, and place items of varying sizes, weighing up to and greater than 50 pounds, while moving up and down a ladder." DE 131 ("Wigdor Rule 59 Aff."), Ex. 2.

"The inquiry into whether a particular function is essential initially focuses on whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential." 29 C.F.R. Pt. 1630, App. § 1630.2(n). It is an inquiry, moreover, "that must be made on a case by case basis." *Id*. at 354. The facts of this case easily supported – and indeed required, as I explain below in connection with Wal-Mart's Rule 59 motion – a determination that the function at issue was not essential to Brady's job, and that it therefore impermissibly tended to screen out a class of individuals whose disabilities would make it difficult to perform the task so described even with a reasonable accommodation.

Wal-Mart employee Joan Little, like Brady, worked as an associate in the pharmacy department. When asked at trial whether she frequently had to "pick up items weighing over 50

pounds while going up a ladder," she responded, "Not usually." Tr. 404. Defendant Chin was asked the same question and indicated that she told Brady that he might be expected to unload a pallet or lift boxes; but she also said, "Usually in the pharmacy area we don't have things over 50 pounds. It is kind of rare." Tr. 429.

Wal-Mart does not point to any evidence before the jury that would support the proposition that lifting objects over 50 pounds while climbing a ladder was an essential function of the job for which Brady was hired. Instead, it argues that the question it asked of Brady was permissible because it did not "seek medically related information or inquire as to whether a person is disabled." Rule 50 Memo. at 30. The argument misses the point: the task of carrying heavy loads up and down a ladder was either an essential part of Brady's job or it was not. If it was not – and there seems to be no dispute that the evidence supported such a finding – then it did not fall within the safe-harbor provisions of the EEOC's regulations.

The question thus becomes whether asking a job candidate about his ability to perform such a task with or without a reasonable accommodation, given its irrelevance to the job for which the candidate is applying, can tend to screen out disabled individuals. To my mind, the answer is obviously yes. It is quite plain that there exists a class of persons who, due to physical disability, cannot frequently carry a items weighing more than 50 pounds up and down a ladder even with a reasonable accommodation.[6] Asking the question at issue here despite its actual

---

[6] The fact that Brady is not a member of that class, and that he in fact answered affirmatively when asked if he could perform the task with or without a reasonable accommodation, does not deprive him of standing to complain of the inquiry. *See Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) ("We agree with our sister circuits that a plaintiff need not prove that he or she has a disability unknown to his or her employer in order to challenge a medical inquiry or examination under 42 U.S.C. § 12112(d)(4)(a).").

irrelevance to the job for which Brady was being considered, therefore supported an inference that Wal-Mart's purpose was to screen out that class of individuals for a reason other than the one permitted by law. Accordingly, Wal-Mart is not entitled to judgment on this issue.

        G.    <u>Punitive Damages</u>

Wal-Mart moves to strike the jury's award of punitive damages – which I have since reduced to $300,000 and allocated entirely to Brady's claim of discrimination under the ADA – on the ground that it was supported by "no evidence" sufficient to show that it consciously discriminated against Brady on the basis of his disability. Rule 50 Memo. at 32. Brady responds that the jury's award of punitive damages was indeed supported by ample evidence that Wal-Mart acted recklessly and was clearly aware of its obligations under the ADA. Rule 50 Opp. at 31-32. I agree with Brady on this point.

Federal law permits an award of punitive damages under the circumstances of this case if Brady proved that Wal-Mart "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [Brady's] federally protected rights[.]" 42 U.S.C. § 1981a(b)(1). The law permitted Brady to meet that burden by proving that Wal-Mart had knowledge that it "may be acting in violation of federal law" – it did not require him to demonstrate Wal-Mart had a contemporaneous "awareness that it [was] engaging in discrimination." *Weissman v. Dawn Joy Fashions, Inc*., 214 F.3d 224, 235 (2d Cir. 2000) (quoting *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 535 (1999) (internal quotation marks omitted)). Stated another way, in order to support an award of punitive damages, Brady had an obligation to prove only that Wal-Mart "discriminate[d] in the face of a perceived risk that its actions [would] violate federal law[.]" *Id*. at 536.

I assess the evidence before the jury, as I must, against this legal standard and in the light most favorable to Brady. Doing so compels me to find there was a sufficient basis for the jury to award punitive damages. In finding that Brady proved his claim of discrimination, the jury necessarily found that Wal-Mart and Chin subjected Brady to an adverse employment action on the basis of his disability. Viewed through that prism, the actions that the defendants took to make things appear otherwise can easily support an inference that the discrimination was done in willful disregard of the law.

For example, a jury that did not find Brady's transfer to the parking lot to be the result of discriminatory animus might find nothing untoward in his subsequent transfer to the food department. But the jury having found that such animus did motivate the first transfer, it might also reasonably concluded that the later transfer – although not an adverse action in light of the fact that it actually improved Brady's work conditions as compared to his duties in the parking lot – was intended to make continued employment an unattractive option for Brady, while avoiding the overt action of firing him that would be a more obvious sign of discrimination.[7] Likewise, once the jury found the existence of discriminatory animus, it could rationally have viewed as particularly egregious the attempt by Wal-Mart's employees to avert that finding through repeated denials of even knowing that Brady was disabled. Moreover, with the Consent Decree in evidence – the propriety of which I address below in Part III.A.1 – the jury was entirely justified in concluding that Wal-Mart had reason to know of its obligations under the ADA and could only

---

[7] In light of the jury instructions and the fact that Brady did not pursue complaint procedures within the store before quitting upon being transferred to the food department, such reasoning on this score would be entirely consistent with the jury's verdict that Brady failed to establish the essential elements of his constructive discharge claim.

have discriminated against Brady as the result of reckless or willful disregard of the law's requirements.

In arguing to the contrary, Wal-Mart relies heavily on Chin's testimony to the effect that she was not aware that Brady was disabled, that she did not know where he would be transferred, and that she explored the possibility of finding Brady a new position rather than firing him. Rule 50 Memo. at 32. Wal-Mart also relies on the fact that at the time of the events in issue, August 2002, it did not yet have an obligation under a consent decree in an earlier case, a redacted copy of which I had admitted in evidence, to provide training to employees such as Chin to comply with the ADA. *Id*.; *see also* Wigdor Rule 59 Aff., Ex. 4 (redacted copy of consent decree in *EEOC v. Wal-Mart Stores, Inc*., No. S99 Civ 0414 (E.D. Ca. Dec. 17, 2001) (the "Consent Decree")).

Wal-Mart's arguments are unavailing. First, to the extent it relies on the self-serving aspects of Chin's testimony – or, perhaps more precisely, the portions of Chin's testimony that served her employer's interest in disclaiming any corporate awareness of Brady's disability – it ignores my obligation to view the record in the light most favorable to the non-movant. The record was more than sufficient for the jury to find that Brady's disability was obvious to Chin and was indeed the reason she did not want Brady working with her in the pharmacy.

Second, the nature of Wal-Mart's argument with respect to the Consent Decree virtually proves Brady's point. The decree set forth obligations that Wal-Mart agreed to undertake as part of the settlement of a separate case. One of those obligations was to comply with the ADA, another was to institute – within one year of the date of the decree, no later than December 17, 2002 – a training program for its employees that would guard against discrimination in the future.

*See* Consent Decree ¶ 63.  At the time of Brady's brief employment at the Centereach store, the deadline for Wal-Mart to establish its training program pursuant to the Consent Decree had not yet elapsed, but it nevertheless had a legally binding obligation to comply with the ADA, and it was on notice that it needed better training of its employees to ensure such compliance.  Wal-Mart appears to argue that during the year between the date of the Consent Decree and its anniversary, it was free to disregard the risk that the supervisory employees who would later be trained might discriminate against people like Brady.  That may be an accurate statement of Wal-Mart's obligations under the decree itself, but it is not an accurate statement of its potential liability for punitive damages for violating the ADA – to the contrary, it is an argument that smacks of the precise kind of recklessness that Wal-Mart claims Brady was unable to prove.[8]

The record sufficed to allow the jury to award punitive damages to Brady.  I therefore deny Wal-Mart's motion for judgment on that issue.

III.    The Defendants' Rule 59 Motion

The defendants assert several bases on which they claim to be entitled to a new trial. They contend that I wrongly admitted unfairly prejudicial evidence, including the Consent Decree and a letter written by Brady's father; that I erred in instructing the jury on a variety of matters; and that the jury's awards of compensatory and punitive damages were against the weight of evidence.  *See generally* DE 122.

---

[8]  Indeed, to the extent that Wal-Mart makes use of the Consent Decree as a source of rights that trumped its obligations under the ADA – in other words, to the extent Wal-Mart implicitly suggests that because the Consent Decree did not require it to establish a specific training program until after Brady's employment, it had no obligation to ensure that its supervisory employees complied with the ADA – the argument that Wal-Mart made to the jury on this score could easily have been viewed as a sign of continuing willful disregard of the law that could only be deterred by the imposition of significant punitive damages.

The standard for granting a new trial under Rule 59(a) is "less stringent" than the standard for relief under Rule 50 in two "significant respects: (1) a new trial under Rule 59(a) 'may be granted even if there is substantial evidence supporting the jury's verdict,' and (2) 'a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.'" *Manley v. Ambase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133-34 (2d Cir. 1998)). But while the standard is more relaxed, "for a district court to order a new trial under Rule 59(a), it must conclude that "'the jury has reached a seriously erroneous result or ... the verdict is a miscarriage of justice,'" *i.e.*, it must view the jury's verdict as 'against the weight of the evidence.'" *Id.* (quoting *DLC Mgmt. Corp.*, 163 F.3d at 133 (quoting *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1047 (2d Cir. 1992) (internal citations omitted))); *see also United States v. Landau*, 155 F.3d 93, 104 (2d Cir. 1998) (holding that a "trial judge may overturn a jury's verdict, even where there is 'substantial evidence' to support it"). Moreover, "[w]here the resolution of the issues depend[s] on [an] assessment of the credibility of the witnesses, it is proper for the court to refrain from setting aside the verdict and granting a new trial." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 363 (2d Cir. 1992). I apply these principles in addressing in turn each prong of the defendants' motion for a new trial.

A.    Evidentiary Rulings

1.    The Consent Decree

The defendants claim to have been unfairly prejudiced in two ways by the admission of portions of the Consent Decree. First, they argue that I erred in admitting the evidence at all. Second, they contend that I compounded the error by allowing Brady to use the evidence for

purposes that exceeded the limits I originally set when I admitted it. DE 122 at 2. I am persuaded by neither assertion.

The Consent Decree recites a variety of obligations that Wal-Mart voluntarily undertook before Brady was hired. It did so as part of the settlement of a separate case in which it did not admit liability. Wal-Mart's obligations under the Consent Decree included a commitment to non-discrimination in hiring disabled persons, conforming hiring procedures with ADA requirements, instituting an ADA training program for its personnel within one year (which had not yet elapsed at the time Wal-Mart hired Brady), and disseminating the company's ADA compliance policy to its various stores.

I admitted the Consent Decree for the limited purpose of showing that Wal-Mart was aware of its obligations under the ADA; I did not admit it for purposes of showing that Wal-Mart was a poor corporate citizen, or that it had previously violated the ADA. I sought to limit its use to its permissible purpose by requiring Brady to redact irrelevant or prejudicial portions and instructing counsel not to argue that Wal-Mart previously violated the ADA. Tr. 21-22. I adhered to that limitation in later instructing the jury that "the only fact that [it] should take into consideration about the fact that there is a Consent Decree being referred to is that Wal-Mart undertook certain obligations." Tr. 421.

The defendants argue that my admission of the Consent Decree was incompatible with both Rule 404(b) and Rule 408 of the Federal Rules of Evidence. I disagree on both counts. Rule 404(b) forbids the admission of "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith." The rule does permit the admission of such evidence for other purposes, including proof of knowledge and intent. My

decision to admit the Consent Decree was entirely consistent with the latter provision. Similarly, while Rule 408 generally prohibits the admission of settlement-related statements "to prove liability for" a claim, it explicitly notes that the proscription does not apply "when the evidence is offered for another purpose" – as it was here. *See Starter Corp. v. Converse, Inc*., 170 F.3d 286, 293 (2d Cir. 1999) (trial judge has broad discretion to admit evidence under Rule 408 when offered for "another purpose") (citation omitted); *United States v. Gilbert*, 668 F.2d 94, 97 (2d Cir. 1981) (holding that a consent decree was properly admitted for the purpose of showing that defendant was aware of reporting requirements).

To the extent the defendants' concern about the Consent Decree is not its admission alone, but rather the contention that Brady used it for impermissible purposes, they have only themselves to blame. The defendants cite four instances, all of them in Brady's closing argument, in which he argued that Wal-Mart's failure to comply with a provision of the Consent Decree was itself a violation of the ADA. DE 123 ("Rule 59 Memo.") at 4. First, they cite counsel's argument about the inquiry into Brady's ability to carry heavy objects up and down a ladder: "not only is it a violation of the Americans with Disabilities Act, but is a violation of a federal court order. It is a violation of the nationwide Consent Decree." Tr. 920. Second, in discussing a claim – which the jury ultimately rejected – that Wal-Mart violated the ADA by subjecting Brady to a drug test before offering him a job, Brady's counsel argued, "it is important because they violated the Americans with Disabilities Act. They violated a federal court order. They violated a Consent Decree." Tr. 926. Third, in addressing the issue of punitive damages, Brady's counsel described the Consent Decree as "the icing on the cake. This is it. Do I need it? No. This is further evidence of discrimination, and this is further reason why you folks need to punish Wal-

Mart ... to let them know they can't violate the Americans with Disabilities Act." Tr. 948. Finally, and again on the subject of punitive damages, Brady's counsel again argued, "Look at the violation of a federal court order, a nationwide Consent Decree ....  You have the power to make sure that Wal-Mart complies with the [ADA].  You have the power to make sure that Wal-Mart complies with the Consent Decree.  A federal court order couldn't do it.  You can." Tr. 963-64.

The defendants' complaints about these portions of Brady's summation are unavailing because the statements they cite all occurred after their own counsel affirmatively, and in violation of the limitation I had imposed, first argued that Wal-Mart had *not* violated the Consent Decree.

The defendants gave their summation first.  Notwithstanding the limitations I had imposed on the parties in using the Consent Decree, and notwithstanding the explicit instruction I had already given the jury about that limitation, the defendants' counsel argued that the evidence showed that Wal-Mart had indeed complied with the Consent Decree, and that when it came to combating disability discrimination, Wal-Mart "was doing the right thing."

> You heard about a consent decree.  You heard Wal-Mart had to undertake some obligations.  You heard from Mr. Bowen about the things they did.  You heard from Doreen Bates they do training.  They gave the CBLs [computer-based learning programs].  They put the posters up, the policy is on the pipeline, other things.  They don't use the matrix.  They use job descriptions.

> You might ask yourself, how much of this has anything to do with Patrick Brady?  How much of this, whatever it means, shows that Patrick Brady was either discriminated against or not discriminated against?

> Well, as you will see when you look at it, the training obligation from the consent decree had to be fulfilled by December '02.  It had to be a year from the date of December '01.  And they did the training in October '02.

> Did it affect Patrick Brady pro or con, whether they did or not?

34

But they complied with the consent decree in Centereach.

Doreen Bates testified that the posters were put up in October. Again, after Patrick Brady, those posters. It didn't affect Patrick Brady pro or con. But *I believe you will see that they complied with the consent decree.*

The same thing with the meetings, and this, that and the other.

Kevin Carter said the ADA policy is on the pipeline. *It is something they were supposed to do and they did.* It has nothing to do with Patrick Brady pro or con.

*What things do show, and you will probably hear something about it, what these things show is that Wal-Mart did a lot of things about disability discrimination issues. Wal-Mart did a lot of things about discrimination disability issues.*

You might hear it said that this somehow shows that Wal-Mart was a bad guy in Centereach because somebody didn't take a test on October 12th, although it says they took the test on October 12th.

But I prefer to view it, or I ask you to view it as a fact that Wal-Mart did a lot of things about disability discrimination that were good things. That is what they did. They did a lot of things.

...

*So, I don't know how much of this you can judge for yourself, how much of this consent decree stuff really has anything to do with Patrick Brady.* However, he was treated pro or con. *But what it does show is Wal-Mart was doing the right thing.*

Tr. 894-97 (emphasis added).

It blinks reality and ignores the law to argue, as the defendants do, that this extended

paean to Wal-Mart's virtue in fighting discrimination in general – and more specifically in

complying with the terms of the Consent Decree – did not invite a response based fairly in the

evidence. I imposed a limitation on the use to which the parties could put the Consent Decree

specifically to avoid the harm to the defendants that an examination of Wal-Mart's compliance

efforts might occasion. The defendants, having cast aside that protection in their closing argument, cannot complain about the natural consequences of their decision now.[9]

There is a related matter that I believe is relevant to and illustrative of the dynamics of my admission of the Consent Decree and the purposes to which I allowed the parties to use it. Before the trial began, I heard arguments *in limine* about Brady's proposal to offer both the Consent Decree and other documents from earlier cases in which Wal-Mart had been accused of violating the ADA. Tr. 3-23. Although I ultimately admitted the Consent Decree for a limited purpose, as described above, I also excluded an order in a different case. That order found Wal-Mart in contempt for failing to meet its obligation under the consent decree in that case to provide ADA training to its employees. *Id*. at 16, 22; *see also* Wigdor Rule 59 Aff., Ex. 4 (copy of contempt order dated June 13, 2001). The latter violation occurred before Wal-Mart hired Brady. *See id*. I arguably therefore should have admitted it as further proof of recklessness on the issue of punitive damages, even before the defendants' summation opened the door to other uses, but instead I decided to exclude it under Federal Rule of Evidence 403. Tr. 16; *see also* Tr. 746 (excluding the contempt order just prior to summations on Rule 403 grounds).

---

[9] That they should not be heard to complain about it does not mean the defendants did not do so. Before the jury began deliberating, the defendants asked for a supplemental instruction based on Brady's references to the Consent Decree in summation. Tr. 1009-10; *see also id*. 1011-13. I acceded to the request and instructed the jury as follows:

> You heard several references yesterday to the consent decree in another case. Now, I want to make sure you understand that that consent decree is not evidence in itself of a past violation of the disability and discrimination laws. You may consider it to assess Wal-Mart's conduct in this case; not in other cases, in this case. That's the purpose for which it is before you.

Tr. 1027-28.

The matter came up again after the defendants' summation, when Brady asked to re-open the evidence and admit the contempt order to respond to the defendants' claim that Wal-Mart complied with the Consent Decree. Tr. 902. Had I known in advance that Wal-Mart would use the evidence before the jury to make such a claim, I might well have admitted the contempt order as well to provide the jury a complete and balanced evidentiary basis on which to assess such argument. But I declined to re-open the evidence after one side had given its summation and noted that the argument was a fair comment on what the evidence showed. Tr. 903.

The litigation over the preclusion of the contempt order limns the issue regarding the Consent Decree. I allowed the latter in evidence for a permissible, limited purpose. That evidence, combined with other evidence before the jury, provided a factual basis for an argument that Wal-Mart complied with its obligations in the Centereach store where Brady worked. Other evidence in the record provided a basis for Brady to respond with a refutation of that proposition. Had the contempt order also been admitted, Brady could more easily have exploded the fiction that Wal-Mart complied with its obligations, but only with respect to collateral matters. By admitting the Consent Decree, the evidence remained focused on what happened in Centereach. And by arguing about Wal-Mart's supposed compliance with that decree in its summation, the defendants forfeited the right to complain when Brady pointed out the evidence that ran counter to their own argument.[10]

_____

[10] More precisely, Wal-Mart waived any such complaint through affirmative conduct rather than merely forfeiting it through failure to make a timely objection. *See United States v. Yu-Leung*, 51 F.3d 1116, 1121-22 (2d Cir. 1995) (differentiating between forfeiture and waiver for purposes of plain error review) (citing *United States v. Olano*, 507 U.S. 725 (1993)).

2.      <u>Admission Of The Letter Written By Brady's Father</u>

Like the other evidentiary issue upon which the defendants seek a new trial, this one involves evidence initially excluded on the basis of their objection and only later admitted after they themselves took steps to forfeit that objection.   The letter about which the defendants here complain became relevant only because the defendants made it so.

Some two weeks after Brady left his job at Wal-Mart, Patrick J. Brady (the plaintiff's father) wrote a letter to Sam Walton, the company's founder.   *See* Wigdor Rule 59 Aff., Ex. 6 (the "Letter"); Tr. 318.   Mr. Brady's letter recounted his version of the events, complained about what he perceived to be an episode of discrimination on the basis of his son's disability, and expressed an intention to furnish a copy of the letter "to every handicapped organization, Television news [sic] and newspaper in the Metropolitan area" and also to write to "my representatives in Washington" in the hope that one of the latter might "convince you to stop discriminating against the disabled."   Letter at 4.   The letter made no mention, explicitly or implicitly, of any threatened or contemplated litigation.

When the plaintiff's father testified that he wrote a letter that he described at trial as one that related, in essence, the substance of his trial testimony, the defendants objected.   Tr. 318.   At a sidebar conference, the defendants' counsel stated that his objection to the letter was on the grounds that it was cumulative and contained hearsay, and I announced my intent to exclude the exhibit.   Tr. 319.   The following colloquy ensued:

> [Brady's counsel]:  And to the extent that [defendants' counsel] Mr. Finger is going to cross-examine this witness on the truth of what happened and the conversations, this was recorded at the time of events prior to any litigation.

The Court: And if he impeaches in a way that opens the door to this letter, that will be a different basis for letting it in. Right now I don't see it.

Mr. Finger: Thank you, your Honor.

Tr. 319-20.

The defendants did not try to impeach Brady's father in the way I had mentioned during his cross-examination; instead, they waited until he was off the witness stand to do it through the testimony of defendant Chin. During her direct examination, her counsel asked how she first learned that Brady had cerebral palsy. Chin's answer gratuitously impeached Brady's father's testimony: "The first time that I heard that he had cerebral palsy, one of the managers had come back to me and said that Patrick's father had come in and said he was going to sue us for discrimination because ... Patrick had cerebral palsy." Tr. 549.

The ellipsis in the preceding quotation marks the point at which Brady's counsel immediately lodged an objection. I overruled that objection because the statement Chin ascribed to the unnamed "manager" was not offered for its truth, and gave the jury a curative instruction. *Id*. But in my view, the testimony had done damage that the instruction alone would not cure. At the conclusion of Chin's testimony, I noted that "the testimony we've heard about the threat to sue ... is a statement that appears to be inconsistent with the testimony of Mr. Brady, Sr., that he wasn't given an opportunity under [Federal Rule of Evidence] 613(b) to confront in any way before it was introduced." Tr. 577. After further colloquy, during which the defendants' counsel suggested that it would be more appropriate simply to elicit further testimony from the plaintiff's father, *see* Tr. 579 ("they could put Mr. Brady back on the stand if he wants to testify"), I decided to "wait until an appropriate foundation [is] laid in rebuttal testimony, and we'll hear [the

defendants'] objection then." Tr. 581. After a short break, however, the defendants' counsel raised the issue again. Starting from the premise that his client's testimony had been not only a surprise to him but also, in his view, factually mistaken, Tr. 583, counsel said that he felt compelled to question defendant Bowen about whether "Mr. Brady said that or if he was aware of such a threat because the existence of it may create an issue in the jury's mind about why did Mr. Bowen do what he did?" Tr. 585. Counsel subsequently did so question Bowen, who answered in the negative when asked if, at the relevant time, he had "hear[d] anything about Mr. Brady's father suing Wal-Mart." Tr. 614.

At that point, as the defendants' counsel noted, the record created the possibility that the jury might wonder if Bowen's actions – transferring Brady to the parking lot and then to the food department – were motivated by the father's threat of a lawsuit. Bowen denied having heard of such a threat, but that did not extinguish the possibility that the father had communicated some such threat to another "manager"[11] – or the possibility that the jury would consider the evidence before it about such a threat as warranting a decision to treat the father's testimony about the course of events he described as unreliable. Moreover, as Brady's counsel later pointed out during further colloquy on the matter, the defendants' counsel asked plaintiff Brady on cross-examination "whether it was his idea to bring this lawsuit." Tr. 748; *see also* Tr. 246. In the

---

[11] The defendants also elicited testimony from Theodore Wicks, a store manager for Wal-Mart who had a telephone conversation with Brady's father, the details of which he said he did not recall, after Brady was transferred to the parking lot. Tr. 677-79. Although Mr. Wicks testified that Brady's father "wasn't happy" about the transfer, *id*. at 679, neither party asked him specifically whether the father threatened litigation during their telephone conversation. *See id*. at 677-83.

exercise of my discretion, I therefore decided to allow Brady to elicit his father's testimony about the Letter and to introduce the document itself.

During the final colloquy on the issue, the defendants' counsel urged me to admit the letter, if at all, in a redacted form that would include its opening and closing paragraphs, but exclude, pursuant to Rule 403, the hearsay recitation of the facts to which the father had already testified. Tr. 748-49. I declined to impose such a limitation:

> ... I'm willing to admit the letter in its entirety. I think the point that the letter will be admitted to address is lost if a redacted version is admitted.
>
> In addition, I think that the whole issue of who decides to sue and what time and on what basis is to some extent, and perhaps an important one, an attack on the credibility of the version of events which are very much in issue here that ... Mr. Brady's father, put before this jury, and I think has been challenged by the cross-examination and by the defense witnesses.
>
> To some extent, this is a roughly contemporaneous version before the litigation and before the threat of litigation, and that's the part you want to redact. For that reason, as well as to address the issue of whether Mr. Brady, Sr., did say as Ms. Chin testified, having heard that he was going to sue, I think it is relevant, and for that purpose I will admit it in its entirety.

Tr. 749-50.

The defendants argue that my decision in that regard was error, and that the effect of that error was exacerbated when Brady's counsel urged the jury to read the Letter. Rule 59 Memo. at 9. They assert that "it is highly likely that the jury based its decision on the impermissible hearsay set forth in [the Letter]." *Id*. at 10. Brady counters that the Letter was not hearsay: it was not offered to prove the truth of the facts it related but only – and properly – to rebut "evidence adduced through Defendants' testimony that Plaintiff's father had threatened to sue

Wal-Mart." DE 128 ("Rule 59 Opp.") at 12. He also argues that Wal-Mart's concern that the jury used the letter improperly is "pure speculation." *Id.*

A trial court has discretion to permit a party to admit evidence that has been previously excluded "when it is needed to rebut a false impression that may have resulted from the opposing party's evidence." *Paolitto v. John Brown E. & C., Inc.*, 151 F.3d 60, 66 (2d Cir. 1998) (quoting *United States v. Rosa*, 11 F.3d 315, 335 (2d Cir. 1993)); *see also United States v. Finley*, 2000 WL 232166, at *2 (2d Cir. Feb. 18, 2000); *Evening Post Pub. Co. v. Voight*, 72 F. 885, 888-89 (2d Cir. 1896). That is precisely what I did here. Moreover, for the reasons I explained before admitting the evidence, the Letter was properly admitted in unredacted form both to preserve its value as proof that there had been no threat of litigation, and to rebut an implicit challenge to the credibility of the plaintiffs' witnesses – including the Letter's author – that suggested his testimony was motivated by the desire for monetary recovery and was recently fabricated. As such, the Letter was not hearsay. *See* Fed. R. Evid. 801(d)(1)(B); *United States v. Wilkerson*, 361 F.3d 717, 726 n.3 (testimony recorded before trial and before alleged motivation to fabricate evidence deemed admissible as non-hearsay under Rule 801(d)(1)(B) when offered to rebut implication that trial testimony was fabricated). I therefore deny this portion of the defendants' motion for a new trial.

B.    Jury Instructions

The defendants challenge as erroneous two different portions of my instructions to the jury: my explanation of the term "adverse employment action," and my charge on the "reasonable accommodation" issue. Rule 59 Memo. at 5-7. They also raise a challenge that relates to the section of my instruction on Brady's claim of a "technical" violation of the ADA on

the basis of a pre-employment question about his ability to perform the tasks listed in the job description: they do not assert that the charge itself was erroneous, but claim that by essentially directing a verdict on that claim, I improperly told the jury that Wal-Mart had violated the ADA. I address each in turn below after first discussing the law pertinent to such challenges.

### 1. The Applicable Legal Standard

A jury instruction is erroneous if "it misleads the jury as to the correct legal standard or if it does not adequately inform the jury of the law." *Pahuta v. Massey-Ferguson, Inc.*, 170 F.3d 125, 136 (2d Cir. 1999) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 552-53 (2d Cir. 1996)). "An erroneous jury instruction, unless harmless, compels reversal." *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 100 (2d Cir. 1999) (quoting *Pahuta*, 170 F.3d at 135). A court's instruction "must be tested by viewing it as a whole and will not be disturbed if it is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." *Pahuta*, 170 F.3d at 136 (quoting *Hathaway*, 99 F.3d at 552-53). It is the party that requests the instruction that "bears the burden of showing that the requested instruction accurately represent[s] the law in every respect." *Wilkerson*, 361 F.3d at 732 (citing *United States v. Abelis*, 146 F.3d 73, 82 (2d Cir. 1998)).

### 2. The Instruction On "Adverse Employment Action"

I instructed the jury on the meaning of the term "adverse employment action" as follows:

> An "adverse employment action" is materially an adverse change in the terms and conditions of employment. To be "materially adverse," a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits or significantly diminished material responsibilities.

43

Tr. 980.

The defendants contend that I should have told the jury that "if an action towards plaintiff taken by defendants was temporary, such as the transfer from the sales associate position to the cart pushing position, then it is not an adverse action under the law." Rule 59 Memo. at 6. They go on to argue that, in light of the evidence, the jury would "[c]learly" have found in their favor if my instruction had also included the "well-settled law that a temporary transfer is not an adverse action[.]" Rule 59 Memo. at 6. I disagree both as to the defendants' assessment of the quality of the charge and its likely effect on the outcome.

The instruction I gave was neither erroneous nor misleading as to the relevant legal standard governing adverse employment actions. Nevertheless, I recognize that the "failure to give a required charge to the jury, if not harmless, constitutes abuse of discretion." *Castro v. QVC Network Inc.*, 139 F.3d 114, 116 (2d Cir. 1998) (citing *Luciano v. Olsten Corp.*, 110 F.3d 210, 218 (2d Cir. 1997)). Nothing, however, compelled the additional language the defendants requested. The language Wal-Mart proposed would have been superfluous: under the instruction as given, the jury could have found that the transfer was of such short duration that it constituted no more that a "mere inconvenience" and found in Wal-Mart's favor on that point. But it was hardly a given, as the defendants purport to believe, that the evidence compelled the conclusion that Brady's transfer to the parking lot was indeed the kind of temporary action that other courts have found to be insufficient for purposes of establishing an adverse employment action. As discussed above in the context of the Rule 50 motion, a jury could easily have concluded that the transfer to the parking lot, although quickly followed by yet another transfer, was anything but the temporary, non-adverse action that Wal-Mart so insistently describes. I

therefore find that the defendants have failed to establish that they are entitled to a new trial on

this score.

### 3. The Instruction On The Reasonable Accommodation Claim

In addressing the reasonable accommodation claim, I instructed the jury as follows:

> The anti-discrimination laws require that when a disabled employee is otherwise qualified to do his job but needs a reasonable accommodation for his disability in order to perform the essential functions of that job, the employer must provide such a reasonable accommodation rather than to subject the employee to an adverse employment action on the basis of his disability.

> The elements of this claim are similar to the first one. In order for Mr. Brady to establish this claim, he must prove each of the following essential elements by a preponderance of the evidence:

> First, that at the time of the events at issue, he was a disabled person within the meaning of the anti-discrimination statute, or he was perceived as such;

> Second, that his employer concluded that the actual or perceived disability prevented him from performing an essential function of his job; and

> Third, that Wal-Mart failed to offer a reasonable accommodation for the actual or perceived disability.

> The first element is the same as in the discrimination claim and I will not repeat my instructions on that element here. As to the third element, the parties agree that Mr. Brady did not request a reasonable accommodation and that Wal-Mart did not offer one.... That leaves the second element as to which the only factual issue is that Wal-Mart knew or had reason to know that Mr. Brady had a disability that made it difficult for him to perform the sales associate's job in the pharmacy, or perceived that he had such a disability.

Tr. 985-86.

To these instructions Wal-Mart would have had me add instructions that Brady "was

under an obligation to request an accommodation" and that he "was required to show that an

accommodation existed that would have allowed him to perform the essential functions" of the

job.  Rule 59 Memo. at 7.  The company also adds, in a footnote, that I should have told the jury that if Brady did not request a reasonable accommodation, he was "required to show that his disability prevented him from requesting one."  *Id.* at 8 n.3.

Had I done as Wal-Mart asked, I would have misled the jury.  As discussed above in the context of the Rule 50 motion, Wal-Mart's proposed instructions describe the general rule that it is the employee's obligation to initiate the discussion regarding the need for a reasonable accommodation.  *See Felix*, 154 F. Supp.2d at 656.  That general rule was inapposite under the circumstances of this case.  Brady conceded that he did not request a reasonable accommodation, and I so instructed the jury.  Instead, Brady sought to invoke an exception to the general rule by arguing that because his disability was obvious and known to Wal-Mart, it was the employer's responsibility to engage Brady in a discussion regarding the need for an accommodation.  *See* 29 C.F.R. § 1630.2(o)(3); *see also Felix*, 154 F. Supp.2d at 657.  My instruction focused the jury's attention on the sole factual dispute that it had to resolve in order to determine whether Brady's theory of liability was valid:  namely, whether "Wal-Mart knew or had reason to know that Mr. Brady had a disability that made it difficult for him to perform the sales associate's job in the pharmacy, or perceived that he had such a disability."  Tr. 986.  For reasons explained above in denying Wal-Mart's motion for judgment as a matter of law, if the jury decided that narrow factual question in Brady's favor, then the remaining facts about which the parties agreed sufficed to establish Wal-Mart's liability.  Accordingly, I deny Wal-Mart's motion for a new trial on the basis of this instruction.

### 4. The Directed Verdict On The Prohibited Inquiry Claim

As discussed above in rejecting the motion for judgment as a matter of law, Wal-Mart disagrees with my ruling that the pre-employment inquiry it made of Brady about his ability to perform the tasks listed in the job description with or without a reasonable accommodation violated the ADA. As part of its motion for a new trial, Wal-Mart argues that my instruction to the jury on that score, which essentially directed a verdict, is not a basis for a new trial on the corresponding count of the complaint, but rather on all the *other* causes of action on which Brady prevailed. Wal-Mart's theory is that my instruction impermissibly "told the Jury that defendants had violated the ADA." Rule 59 Memo. at 8.

If Wal-Mart was concerned on that score, it might have done well to tell me so before I gave the instruction it now challenges. It did not. *See* Charge Tr. 21-22; Tr. 1024-25.

Moreover, the record conclusively refutes Wal-Mart's claim that, as a result of my instruction, "the Jurors went into their deliberations believing, erroneously, that defendants were already guilty because the Court told them so." Rule 59 Memo. at 8. The jury did not reflexively find against Wal-Mart on all of Brady's causes of actions. Instead, it found in Wal-Mart's favor on two of Brady's other adverse employment action claims (the transfer from the parking lot to the food department and constructive discharge), and it entirely rejected Brady's accusations against defendant Bowen. Perhaps most illuminating on this score is the fact that the jury found in Wal-Mart's favor on the most closely related cause of action: Brady's claim that Wal-Mart committed a similar technical violation of the ADA by impermissibly asking Brady to take a drug test before making a conditional offer of employment. Verdict Sheet at 3 (Question 3-B).

Wal-Mart was not prejudiced on other causes of actions by my instruction on the prohibited inquiry claim. Moreover, I adhere to the view that that instruction, and the legal ruling on which it was based, was correct. I therefore deny Wal-Mart's motion for a new trial on the basis of erroneous jury instructions.

C.    Compensatory Damages

The defendants ask me either to vacate the jury's award of $2,500,000 in compensatory damages on the state discrimination claims or to order a remittitur that would force Brady to choose between a new trial on damages or a reduced compensatory damages award of $50,000. Rule 59 Memo. at 19.[12] They predicate this part of their motion on three grounds: they claim that there was insufficient evidence to support Brady's hostile work environment claim, that the award was against the weight of the evidence, and that the sheer size of the award indicates that the jury was improperly swayed by "passion and prejudice." *Id*. at 10-13. Brady disagrees on all counts and opposes the proposed remittitur. *See* Rule 59 Opp. at 14-25.

To a large extent, this portion of the defendants' motion can easily be resolved. I need not address the hostile environment claim for the same reason I had no occasion to do so in the context of the Rule 50 motion. I also reject the proposition that a new trial is required because the damages award was against the weight of the evidence. As Brady's response amply details, the jury had before it evidence that Wal-Mart's discrimination had far more severe consequences for Brady than mere "garden-variety" emotional distress. Rule 59 Opp. at 15-19. My assessment

---

[12]  The defendants also seek a new trial on the ground that the issue of punitive damages should not have been placed before the jury. That part of their motion rises no higher than the corresponding portion of their Rule 50 motion, and I therefore reject it for the reasons described above in addressing that corresponding argument.

of the size of the jury's award, however, and of the corresponding issue of remittitur, does require

some discussion, to which I now turn.

### 1.    The Applicable Legal Standard

If I find the jury's damages award to be excessive, I have the discretion either to overturn

that award, or to order remittitur – that is, to make the order of a new trial conditional on Brady's

refusal to accept reduced damages in an amount I specify.  *See Textile Deliveries, Inc. v. Stagno*,

52 F.3d 46, 49 (2d Cir. 1995); *see also Rangolan v. County of Nassau*, 370 F.3d 239, 244-45 (2d

Cir. 2004).  I should not order a new trial unless I am "convinced that the jury has reached a

seriously erroneous result or that the verdict is a miscarriage of justice." *Rainone v. Potter*, 2005

WL 2258301, at *1 (E.D.N.Y. Sept. 17, 2005) (quoting *Hugo Boss Fashions Inc. v. Fed. Ins*.

Co., 252 F.3d 608, 623 (2d Cir. 2001)); *see also Earl v. Bouchard Transp. Co.*, 917 F.2d 1320,

1328 (2d Cir. 1990).  Moreover, "the size of a jury's verdict may be so excessive as to be

'inherently indicative of passion or prejudice' and [therefore] require a new trial." *Ramirez v.

New York City Off-Track Betting*, 112 F.3d 38, 40-41 (2d Cir. 1997) (quoting *Auster Oil & Gas,

Inc. v. Stream*, 835 F.2d 597, 603 (5th Cir. 1988)).  If the award is so excessive, remittitur is not

the proper remedy unless the trial proceedings were otherwise "free of prejudicial error[.]" *Id*. at

40 (citing *Werbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd*., 930 F.2d 1021,

1027-28 (2d Cir. 1991)).  On the other hand, if, as I believe to be the case here, there is no other

prejudicial error, then remittitur is the proper response to an excessive verdict.  In that case, I

should condition the denial of a new trial on Brady's acceptance of "the maximum award that

would not be excessive." *Ruhlmann v. Smith*, 323 F. Supp.2d 356, 366 (N.D.N.Y 2004) (quoting

*Noga v. Potenza*, 221 F. Supp.2d 345, 351 (N.D.N.Y. 2002)).

a.      The "Deviates Materially" Standard

The parties agree that in determining whether the award in this case was excessive, I must look to the law of New York. They do not agree, however, on what the applicable standard under that state's law is. When they first briefed the motion, both sides analyzed the issue under the following provision of New York's Civil Practice Law and Rules ("CPLR"):

> In reviewing a money judgment in an action in which an itemized verdict is required by rule forty-one hundred eleven of this chapter in which it is contended that the award is excessive or inadequate and that a new trial should have been granted unless a stipulation is entered to a different award, the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation.

CPLR § 5501(c) (McKinney 2005). Although the provision refers to appellate review, the courts of New York have held, and the parties agree, that it applies with equal force to a trial court reviewing a motion for a new trial or remittitur. *See, e.g.*, *Inya v. Ide Hyundai, Inc.*, 209 A.D.2d 1015 (N.Y. App. Div. 1994); *see also* Rule 59 Memo. at 15; Rule 59 Opp. at 22.

In light of the language of § 5501(c) itself, and in particular its reference to a particular class of cases in which an itemized verdict is "required," I was not so sure that the "deviates materially" standard applies. I asked the parties about it at oral argument on the instant motion, and offered them an opportunity to submit further briefing on the matter. DE 158. Somewhat predictably, the defendants adhered to their position that the "deviates materially" standard applies. DE 162. Just as predictably, Brady reversed course and embraced the more relaxed "shocks the conscience" standard of review. DE 163. As explained below, I believe the law compels me to steer a middle course, albeit one closer to Wal-Mart's position than to Brady's.

50

The plain text of § 5501(c) specifies that the "deviates materially" applies in an action in which an "itemized verdict" is "required" pursuant to CPLR § 4111. Thus, my first task is to determine if this is such an action; if it is not, then I must look to another source of New York law to discover the applicable standard for assessing the question of excessiveness.

Section 4111 of the CPLR has several subsections, none of which appears apposite to this case. The first three set forth procedures associated with general and special jury verdicts; none purports to define a class of cases in which an itemized verdict is required. *See* CPLR § 4111(a)-(c). The procedures associated with itemized verdicts are set forth in the next three subsections. *See id.* § 4111(d)-(f). None of those provisions, however, appears to have anything to do with Brady's discrimination claims under the state's Human Rights Law: subsection (d) applies to actions seeking damages in "medical, dental, or podiatric malpractice" suits; subsection (e) applies in actions for personal injury and wrongful death against a "public employer" – a class of defendants that includes neither Wal-Mart nor Chin nor Bowen; and subsection (f) applies to actions to recover damages for "personal injury, injury to property or wrongful death." *Id*.

Of all of these provisions, the only one that even arguably comes close to the circumstances of this case is the "personal injury" provision in subsection (f). No such argument would be reasonable, however, as New York defines "personal injury" to include "libel, slander and malicious prosecution; also an assault, battery, false imprisonment, or other actionable injury to the person either of the plaintiff, or of another[.]" N.Y. Gen. Constr. Law § 37-a. Given this statutory definition, Brady's claims did not include a cause of action for "personal injury" and therefore also did not require an itemized verdict pursuant to CPLR § 4111.

A reading of § 5501(c) that limits its rule to the circumstances it explicitly and unambiguously invokes is not only consistent with normal principles of statutory construction, it is also consistent with the legislative history that I need not in any event consult. In enacting the statute, the New York legislature explicitly stated that its purpose was to "restrain increases in medical and dental malpractice premiums and related costs and to prevent medical and dental malpractice." *See* 1986 N.Y. Sess. Laws 470, 1574 (McKinney). By way of example, citing damages in personal injury, the New York legislature stated that the "former" shocks-the-conscience standard "provided insufficient review of awards and the new standard ... will invite more careful scrutiny." *Id.*; *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 423 n.3 (1996) (noting that the New York legislature sought to "curtail medical and dental malpractice"). In contrast, when enacting the NYHRL under which Brady seeks relief, the legislature declared "that the state has the responsibility to act to assure that every individual within [New York] is afforded an equal opportunity to enjoy a full and productive life." N.Y. Exec. L. § 290, ¶ 3. Each statute appears to have been enacted for entirely unrelated policy purposes.

Notwithstanding the textual limits of § 5501(c), it is undeniable that federal courts in this circuit have applied the "deviates materially" standard to review for excessiveness jury awards in discrimination cases under state law. *See*, *e.g.*, *Cross*, 417 F.3d at 258; *Shea v. Icelandair*, 925 F. Supp. 1014, 1020-21 (S.D.N.Y. 1996); *Anderson v. YARP Rest. Inc.*, 1997 WL 27043, at *8 (S.D.N.Y. January 23, 1997) (citing *Shea*); *Tanzini v. Marine Midland Bank*, 978 F. Supp. 70, 77-78 (N.D.N.Y. 1997); *Bick v. City of New York*, 1998 WL 190283, at *22 (S.D.N.Y. April 21, 1998). While that is so, my review of those cases does not lead me to the conclusion that they

did so because the substantive law required it. More precisely, my review of prior decisions is that no federal court applying the "deviates materially" standard has relied on anything other than §5501(c) itself or other cases that do so. I have not seen any decision that identifies a law *other* than § 5501(c) that requires application of the "deviates materially" standard in a discrimination case (aside from *Cross* which applies both that standard and the one described below). But for the reasons set forth above, I believe that the plain text of that statute makes clear that it does not control this case.

b.    The *Transit Authority* Standard

The preceding discussion explains why I believe that "deviates materially" is not the appropriate standard – or, at least, that I am not required to apply it by virtue of CPLR § 5501(c). That conclusion only begs the question of identifying a standard that does apply in the context of a jury award pursuant to the NYHRL. I now turn to that question. As explained below, I find that New York courts interpreting the relevant statute have embraced a standard of review that is similar but not identical to the "deviates materially" standard.

Section 297 of the New York Executive Law creates a private right of action for a person alleging discrimination in violation of the NYHRL. It allows such a person to bring a claim either before an administrative judge in the State Division of Human Rights (the "Division") or before "any court of appropriate jurisdiction." *See* N.Y. Exec. Law § 297 ¶¶ 1, 9. Section 298 of the Executive Law provides for judicial review of a verdict rendered in either setting, permitting the court to enforce it, modify it, or set it aside based on factual findings that are "supported by sufficient evidence on the record considered as a whole." This statute does not specify a

particular standard for reviewing damage awards for mental suffering. However, as described below, the courts of New York have inferred such a standard.

In *New York City Transit Auth. v. State Div. of Human Rights*, 78 N.Y.2d 207 (1991) ("*Transit Authority*"), the New York Court of Appeals reviewed an appellate court's decision to reduce an award of compensatory damages for mental anguish in a case of intentional discrimination on the basis of gender. The Division's Commissioner, upon making a finding of intentional discrimination, had awarded the plaintiff a total award of $450,000 in compensatory damages for mental anguish. The intermediate appellate court subsequently reduced that award to $75,000 on the ground that the Commissioner's award was excessive.

The Court of Appeals reversed. It began its analysis by noting the difficulty of its task:

> Throughout tort law, psychic injury – by nature essentially subjective – has prompted difficult questions of proof, both as to genuineness of any injury and as to fixing its dollars-and-cents valuation .... Such questions have particular pertinence to Human Rights Law cases, where mental suffering is not only compensable ... but also a frequent – sometimes sole – consequence of unlawful discriminatory conduct.

*Id*. at 215 (citations omitted). After going on to discuss the role of the Commissioner in answering such questions – a matter to which I return below – the court explained why the standard for assessing an award in a discrimination case should not necessarily be as exacting as in other contexts:

> ... the extremely strong statutory policy of eliminating discrimination gives the Commissioner greater discretion in effecting an appropriate remedy than under strict common-law principles. While the objective of the common-law right is to provide private remedies, in Human Rights Law cases the right is statutory and involves vindication of both the individual's interests and those of society. "[D]ue to the strong anti-discrimination policy spelled out by the Legislature of this State ... aggrieved individual[s] need not produce the quantum and quality of evidence to prove compensatory damages [they] would have had to produce under an

54

analogous provision, and this is particularly so where, as here, the discriminatory act is intentionally committed."

*Id*. at 216 (quoting *Batavia Lodge No. 196, Loyal Order of Moose v. State Div. of Human Rights*, 35 N.Y.2d 143, 147 (1974)).

Based on its analysis of the legislature's purpose, the court held that the appellate court had erred in reviewing the Commissioner's award. In particular, the court identified three critical components that should be employed in reviewing a Commissioner's award of compensatory damages for mental anguish arising from unlawful discrimination under the Human Rights Law: (1) the existence of a compensable mental injury reasonably related to the wrongdoing, (2) whether the award was supported by some evidence of the magnitude of the injury, and (3) how the award compared with other awards for similar injuries. *Id*. at 216-19.

The first inquiry tests whether the plaintiff proved the existence of a compensable mental injury. In that regard, the court held that a plaintiff need not introduce medical testimony or evidence of professional treatment to support a claim of mental injury, but instead may rely on nothing more than "the complainant's own testimony, corroborated by reference to the circumstances of the alleged misconduct." *Id*. at 216.

The second inquiry requires "some evidence of the magnitude of the injury," that would indicate that the award was "neither punitive nor arbitrary." *Id*. at 217. The opinion in *Transit Authority* offers little guidance for performing such an evaluation. It does, however, suggest a high degree of deference to the Commissioner's decision in that regard, and cautions that a reviewing court should not substitute its own estimate of full compensation for the plaintiff's

mental injury in place of the Commissioner's. *Id*. This begs the question, to which I turn momentarily, whether a jury's award of compensatory damages is entitled to similar deference.

Finally, the Court's directive to compare the award under review with "other awards for similar injuries" appears to mean the reviewing court must determine if the amount awarded is "within the range of awards previously approved by this and other courts." *Id*. at 217 (quoting *Consol. Edison Co. v. State Div. of Human Rights*, 77 N.Y.2d 411, 421 (1991) (citations omitted)). This entails a comparison – both "qualitatively and quantitatively" – with cases of similar injury. *Id*. I explore the relationship between this inquiry and the "deviates materially" standard below.

c. <u>Is A Jury Entitled To The Same Deference As The Commissioner?</u>

In *Transit Authority*, the Court of Appeals reviewed a decision by the Commissioner, not a jury verdict. The court did not specify, however, whether the same standard of review it applied in that case would also apply to a jury's award of compensatory damages for mental injury. The decision leaves some uncertainty on the matter because of the language it used to introduce the three-part inquiry – some of which appears equally applicable to either a jury verdict or an administrative decision, and some of which makes sense only in the latter context. The court began its analysis by noting that an award of compensatory damages can come from either a jury or the Commissioner: "Unlawful discriminatory conduct may be redressed by court action, or by administrative action[.]" *Id*. at 215 (citing N.Y. Exec. Law § 297). The court went on to note "the important objectives of the Human Rights Law," *id*., and the "extremely strong statutory policy of eliminating discrimination[,]" *id*. at 216. Such comments suggest that the

statutory purpose is advanced by a relatively deferential standard of review regardless of who determined the damages award. On the other hand, the court explicitly referred to the administrative agency's expertise resulting from "its four decades of special experience in weighing the merit and value of such claims." *Id*. Such expertise, which a lay jury necessarily lacks, might well justify showing greater deference to an administrative award than to a jury verdict.

As far as I can determine, the Court of Appeals has not explicitly decided the matter. I must therefore essay to "predict" how it "would" do so. *O'Neill v. City of Auburn*, 23 F.3d 685, 689 (2d Cir. 1994); *see also In re Brooklyn Navy Yard Asbestos Litigation*, 971 F.2d 831, 850 (2d Cir. 1992). Although not binding, the "best indicators of how it would decide are often the decisions of lower state courts." *Id*. I therefore examine New York state court cases that reviewed jury awards of mental injury damages after *Transit Authority* to determine whether they purported to apply the same standard as that case, or a different one.

The first such published opinion I have found is *Sogg v. American Airlines*, N.Y. L.J., June 4, 1992, at 24 (N.Y. Sup. Ct. June 3, 1992), *aff'd*, 193 A.D.2d 153 (N.Y. App. Div. 1993). The jury in that case found that the defendant had discriminated against the plaintiff on the basis of gender, age, and disability, and awarded $1,125,000 in damages. The court reduced that award to $400,000. *Id*. In doing so, the court referred to the "deviates materially" standard, *id*. (citing *Harvey v. Mazal Am. Partners*, 78 N.Y.2d 855 (1992)), but explicitly stated that its analysis "must begin with" the decision in *Transit Authority*. *Id*.[13] The court did not suggest that

---

[13] After referring to the "deviates materially" standard, the court in *Sogg* noted that "[t]hat standard is *also* embodied in CPLR 550(c) [sic]." N.Y. L.J., June 4, 1992, at 24 (emphasis added). Such language suggests that the court recognized that CPLR § 5501(c) did not actually

its reliance on the latter precedent was in any way tempered by the fact that the award under review had been set by a jury rather than by the Commissioner. Other decisions, while purporting to apply the standard under § 5501(c), have similarly looked for guidance to the decision in *Transit Authority*, without any suggestion that the standard in that case is inapposite outside the context of administrative decisions. *See Gleason v. Callanan Indus., Inc.*, 203 A.D.2d 750, 752 (N.Y. App. Div. 1994); *McIntyre v. Manhattan Ford, Lincoln Mercury, Inc.*, N.Y. L.J., Nov. 21, 1997, at 25 (N.Y. Sup. Ct. Nov. 20, 1997) (reducing award of $1.3 million in emotional damages to $650,000), *modified*, 256 A.D.2d 269 (N.Y. App. Div. 1998) (further reducing award to $243,750).

In still other cases, the courts did not follow *Transit Authority* at all, but instead addressed the question of excessiveness only under the "deviates materially" standard. *See Rhoades v. Niagara Mohawk Power Corp.*, 202 A.D.2d 762, 764 (N.Y. App. Div. 1994) (reducing jury award of $575,000 in gender discrimination case to $350,000, and relying on CPLR § 5501(c) despite the "error" – which it described as "harmless" – that the jury did not itemize its verdict pursuant to CPLR § 4111(f)); *Reinach v. Wisehart*, 209 A.D.2d 332 (N.Y. App. Div. 1994) (finding jury award for mental anguish did not "deviate materially from what would be reasonable compensation," but not explicitly citing § 5501(c)); *Liska v. Paramount Group Inc.*, 213 A.D.2d 346 (N.Y. App. Div. 1995) (citing § 5501(c) in holding that a jury award of $95,000 for mental anguish resulting from discrimination on the basis of disability did not deviate materially from an amount that would be reasonable); *Gallegos v. Elite Model Mgmt. Corp.*, 1

_____

apply to the case before it. I note, moreover, that the *Harvey* case the court also cited in conjunction with the "deviates materially" standard was a personal injury action to which § 5501(c) would presumably have applied. 79 N.Y.2d 218, 225-26 (1992).

Misc.3d 907(A) (N.Y. Sup. Ct. 2004) (reducing jury award of $2 million for past and future pain and suffering to $1.1 million), *vacated on other grounds*, 28 A.D.3d 50 (N.Y. App. Div. 2005).

I have found only one case that directly addresses whether the *Transit Authority* standard applies with full force when the award under review is the result of a jury's decision rather than the Commissioner's. In *Boodram v. Brooklyn Dev. Ctr.*, 2 Misc.3d 574, 588-89 (N.Y. Civ. Ct. 2003), the court noted the existence of a "serious question" as to whether the deference due to a Commissioner's award should also apply in the context of jury verdicts. *Id*. at 588. It then went on to explain that under the *Transit Authority* standard, once a rational basis for the Commissioner's determination is found, even when there is room for alternative conclusions, "the judicial function is exhausted." *Id*. (citing *State Div. of Human Rights v. City of New York*, 70 N.Y.2d 100, 106 (1987)). As a result, the court reasoned, an award that would survive a motion for judgment as a matter of law would necessarily also survive a motion to set it aside as against the weight of the evidence – a result that it concluded must be wrong:

> There is nothing in the statute or case law that suggests the Legislature or the Court of Appeals intended such a drastic change as would result from, in effect, precluding review of a jury verdict to determine whether it is against the weight of the evidence. Nor does any principle or policy argue for such a result. There is no insult to the jury in recognizing that, despite its continually-proven practical wisdom in matters of common living, none of its particular collectives is likely to possess the expertise to which deference is given by the "substantial evidence" standard.

*Id*. at 589.[14]

---

[14] The Court of Appeals used the term "sufficient evidence" in describing the second prong of the review standard in *Transit Authority*. At least one appellate court in New York has since interpreted that usage to mean "substantial evidence." *Boodram*, 2 Misc.3d at 582 (citing *Burlington Indus. v. New York City Human Rights Comm'n*, 82 A.D.2d 415, 417 (N.Y. App. Div. 1981)).

Having concluded that the deference due to a Commissioner's award is not quite the same as the standard to be used in reviewing a jury verdict, the court in *Boodram* hastened to add that the latter standard is not all that different:

> This court concludes, therefore, that the "substantial evidence" standard does not foreclose full review of a jury verdict .... That is not to say that decisions reviewing awards made by the Commissioner are not highly important to the review of jury verdicts, and certainly should not suggest that the strong public policy of full compensation for victims should not guide the court's assessment of the evidence. It merely acknowledges that courts cannot avoid their traditional, and often difficult, role in reviewing jury verdicts on weight-of-the-evidence motions.

*Id*.

In attempting to predict how the Court of Appeals would decide the question of deference, I would reach much the same result by a slightly different road. In my view, the analysis in *Boodram* accords too much deference to the Commissioner: by assuming that an award that survives a motion for judgment as a matter of law would be immune to a challenge akin to a motion to set aside a verdict as against the weight of the evidence, the *Boodram* court appears to have given little if any weight to the effect of the third prong of the *Transit Authority* inquiry, which compares the Commissioner's award to "other awards for similar injuries." 78 N.Y.2d at 219. But the overall result I reach is the same: *Transit Authority* applies to jury awards, and requires me to give due consideration to the legislative goal of eliminating discrimination by affording its victims full compensation without evading my responsibility to ensure that the award is not against the weight of the evidence.

d.      Comparing The *Transit Authority* Standard To The
        "Deviates Materially" Standard

What, then, is the relationship between the somewhat amorphous standard of *Transit*

*Authority* and the "deviates materially" standard under § 5501(c)?  In attempting to define the

former, it is easiest to start with what it is not.  The *Transit Authority* opinion itself teaches that

the Court of Appeals did not intend, in the context of discrimination cases, to return to a standard

that would void an award as excessive only if it could be said to "shock the conscience."  *See* 78

N.Y.2d at 218 n.2.

Nor can it be considered identical to the "deviates materially" standard.  The Second

Circuit has explicitly adverted to the standard in *Transit Authority* as one that "must also" be

applied when assessing an award for mental anguish under the "deviates materially" standard,

thus suggesting that the two are not the same.  *Meacham v. Knolls Atomic Power Lab.*, 381 F.3d

56, 77-78 (2d Cir. 2004), *vacated on other grounds* 544 U.S. 957 (2005).[15]  In addition, a survey

of published state court decisions reviewing administrative awards of compensatory damages for

discrimination under the Human Rights Law since 1986 (when § 5501(c) was enacted), as set

forth in the margin, reveals that such reviewing courts rely on neither § 5501(c) nor the "deviates

materially" standard.[16]  Finally, the decision in *Boodram* – the one decision I have found that has

_____

[15]  As set forth above, a number of state court cases likewise cite § 5501(c) and then go on to
apply principles from *Transit Authority* in reviewing jury verdicts.  *See Sogg*, N.Y. L.J., June 4,
1992, at 24; *Gleason*, 203 A.D.2d at 751; *McIntyre*, N.Y. L.J., Nov. 21, 1997, at 25.

[16]  *Anchor Motor Freight Inc. v. McCall*, 119 A.D.2d 672 (N.Y. App. Div. 1986) (discrimination
on the basis of religion); *Wantagh Union Free Sch. Dist. v. State Div. of Human Rights*, 122
A.D.2d 846 (N.Y. App. Div. 1986) (discrimination on the basis of age and gender); *State Div. of
Human Rights v. County of Onondaga Sheriff's Dept.*, 127 A.D.2d 986 (N.Y. App. Div. 1987)
(discrimination on the basis of race and gender); *State Div. of Human Rights v. Goodwill Indus.,
Inc.*, 129 A.D.2d 995 (N.Y. App. Div. 1987) (vacating award for insufficient evidence of mental

explicitly considered the applicability of *Transit Authority* in the specific context of a jury award – likewise appears to discern at least some daylight, if not much, between "deviates materially" and the standard that applies under the NYHRL: "Without suggesting that the 'material deviation' standard is without its own difficulties in application ... it appears sufficiently similar to the comparability requirement [*i.e.*, the third prong of *Transit Authority*] that its application in reviewing jury verdicts under the Human Rights Law should be consistent with existing case law." 2 Misc.3d at 588.

At a minimum, *Boodram* suggests that an application of *Transit Authority* – even in the context of a jury award rather than an administrative decision entitled to more deference – should be guided by the "strong public policy" to fully compensate victims of discrimination. *Id*. at 589. In contrast, the policy driving the enactment of § 5501(c) was to control "high malpractice premiums" by giving courts greater powers to review verdicts challenged as excessive. *See* 1986

anguish); *SUNY Coll. of Envtl. Sci. and Forestry v. State Div. of Human Rights*, 144 A.D.2d 962 (N.Y. App. Div. 1988) (discrimination on the basis of gender); *Unitel Video, Inc. v. State Div. of Human Rights*, 147 A.D.2d 377 (N.Y. App. Div. 1989) (discrimination on the basis of gender); *Consol. Edison Co. of New York v. State Div. of Human Rights*, 77 N.Y.2d 411 (1991) (discrimination on the basis of race and gender); *Obstfeld v. Brandon*, 180 A.D.2d 638, (N.Y. App. Div. 1992) (discrimination on the basis of national origin and marital status); *Quality Care, Inc. v. State Div. of Human Rights*, 194 A.D.2d 610 (N.Y. App. Div. 1993) (discrimination on the basis of race); *City of Fulton v. State Div. of Human Rights*, 221 A.D.2d 971 (N.Y. App. Div. 1995) (discrimination on the basis of disability); *Tiffany & Co. v. Paula Smith*, 224 A.D.2d 332 (N.Y. App. Div. 1996) (discrimination on the basis of gender); *Rio Mar Rest. v. State Div. of Human Rights*, 270 A.D.2d 47 (N.Y. App. Div. 2000) (discrimination on the basis of gender); *Cornelius v. State Div. of Human Rights*, 286 A.D.2d 329 (N.Y. App. Div. 2001) (upholding Division's dismissal of complaint); *Camp v. State Div. of Human Rights*, 300 A.D.2d 481 (N.Y. App. Div. 2002) (stating that there was a "rational basis" for Division's finding of no probable cause); *Exxon Shipping Co. v. State Div. of Human Rights*, 303 A.D.2d 241 (N.Y. App. Div. 2003) (discrimination on the basis of age); *Pathak v. State Div. of Human Rights*, 13 A.D.3d 634 (N.Y. App. Div. 2004) (upholding Division's dismissal of complaint); *State Div. of Human Rights v. Dom's Wholesale and Retail Center*, 18 A.D.3d 335 (N.Y. App. Div. 2005) (hostile work environment).

N.Y. Sess. Laws 470, 1574 (McKinney). Thus, while both standards require a review of verdicts in like cases, I infer that New York law does not require the same vigilance in application under the "comparability" prong of *Transit Authority* as it does under the "deviates materially" standard of the CPLR. Stated another way, § 5501(c) appears to be designed to guard against chilling the availability of health care, and therefore errs on the side of too little compensation for malpractice victims, whereas the Human Rights Law, as interpreted by *Transit Authority*, perceives a legislative intent to avoid insufficiently compensating the victims of discrimination.[17] With this understanding of *Transit Authority* and its relationship to the "deviates materially" standard, I turn to its application to the facts of this case.

### 2. The Jury's Award Of Compensatory Damages Was Excessive

Brady easily meets the first prong of the *Transit Authority* standard. The record contains ample evidence such that the jury could find that Brady's suffering was reasonably related to Wal-Mart's discriminatory conduct. As noted earlier, this prong has been interpreted to be a standard of "causation, and ... as such it is no less favorable to claimants than the traditional tort rules." *Boodram*, 2 Misc.3d at 589-90. Brady's mother testified that prior to her son's experience at Wal-Mart he was "a happy kid," "easygoing," and "mild mannered." Tr. 353. Brady's father testified that his son "withdrew" as a result of his experience at Wal-Mart, preferring to spend time alone in his room rather than with the family as he had done before. Tr.

---

[17] In *Boodram*, the court reviewed a jury's award for future lost earnings, an issue of first impression. After noting that the "material deviation standard calls for a comparison with verdicts sustained in similar cases," the court observed that "there is little available in the New York cases" and sustained the award on the basis of the "strong policies of Human Rights Law." *Id*. at 595-96 (quotations omitted). Rather than analogizing to cases that share similar characteristics, if not similar facts, the court reduced the award from $392,000 to $350,000 because it found the jury made a mathematical error. *Id*. at 596.

320. Brady himself testified that became "depressed," that he lost his "self-esteem," and that "everything [he] had accomplished was washed away by what happened at Wal-Mart." Tr. 182-83.

Brady also meets the second prong, as there is "substantial evidence" supporting the jury's award for compensatory damages. Brady was born with cerebral palsy, and the jury had before it evidence that the condition permeated every aspect of his life. Tr. 110. The jury had substantial evidence to support a finding that Brady's malady adversely affected his academic performance and undermined his self-esteem while he was in school, for which he received counseling. *See* Tr. 184-85, 333-34, 350-52. Such testimony could persuade the jury that a lifetime of struggling with his condition left Brady particularly susceptible to emotional harm flowing from the discrimination to which the defendants subjected him. *See Bialik v. E.I. Dupont de NeMours & Co. Inc.*, 142 Misc.2d 926, 929 (N.Y. App. Div. 1988) (characterizing plaintiff as a "'mental eggshell' ready to be cracked").

The record further supported a finding that the defendants' discrimination did in fact cause Brady great suffering. Brady's parents testified that his experiences at Wal-Mart adversely affected his relationship with the rest of his family. They said he "started getting loud and nasty and cursing at his mother and sister" – behavior that he had not previously exhibited. Tr. 320, 353. They also testified that their son lost interest in school, experienced a loss of appetite, cried for no apparent reason, paced in his room unable to sleep at night, and displayed an overall demeanor that steadily worsened over time. Tr. 358. They described one particularly harrowing emotional outburst, which Mrs. Brady described as a "total breakdown," that prompted the

Bradys to take their son to a hospital emergency room, where he ultimately was referred to a psychiatrist named Krishna Gujavarty. Tr. 321, 359-61.

Dr. Gujavarty testified that he diagnosed Brady as suffering from "generalized anxiety disorder" and believed that his patient might in addition be depressed. Tr. 435. Dr. Gujavarty decided to treat Brady with a combination of psychotherapy and the anti-anxiety drug Buspar. Tr. 436. Brady continued to take Buspar for over two years, and he remained under the psychiatrist's care from the time of his initial visit in October 2002 through the date of the doctor's testimony at the trial in February 2005. Tr. 434-35. Dr. Gujavarty testified that Brady "gradually improved" with treatment, but that his recovery was not uniform and that he "slipped back" at times. Tr. 437. Asked whether Brady was "cured" at the time of his testimony, Dr. Gujavarty responded that his patient had "returned a great deal to the baseline" but was not completely restored to his emotional condition prior to the events at issue. Tr. 437-38.

Brady testified that his experience at Wal-Mart "still affects" him, and that his "emotions are getting better, but some of them are still kind of shaky." Tr. 186. He acknowledged that he had managed to graduate from Suffolk Community College with a degree in liberal arts in January 2005. Tr. 189-90. He also acknowledged that, with the help of an employment agency specializing in placing individuals with disabilities, he had secured employment at a convenience store, but said that he was too "embarrassed" to ask to be reinstated as an assistant in the pharmacy in which he had worked prior to applying to Wal-Mart. Tr. 187.

On the basis of this record, the jury could easily find that Brady experienced serious emotional trauma as a result of his treatment at Wal-Mart. The jury plainly had a basis to award

significant compensatory damages for mental anguish. How much it could reasonably award, however, is a more difficult question.

Whether I analyze it under the "deviates materially" standard of § 5501(c) or the more nuanced approach of *Transit Authority*, I cannot sustain the jury's award of $2.5 million as compensation for Brady's emotional distress. With respect to § 5501(c), the award does deviate materially from other awards that the parties have cited, as the discussion below will illustrate. And under the *Transit Authority* analysis, the third prong – requiring a comparison to other awards – compels a similar result.

Moreover, while I believe the jury had ample basis to conclude that Brady's injury was serious and warranted substantial compensation, I cannot say with equal confidence – despite the existence of "some evidence of the magnitude of the injury" – that the award was "neither punitive nor arbitrary." *Transit Authority*, 78 N.Y.2d at 217. My inability to do so results from the portion of Brady's summation that blurred the distinction between compensation and punishment. For example, after describing Brady's "economic damages," his counsel referred jointly to the "other two calculations ... for emotional distress and punitive damages." Tr. 959. The attorney went on to discuss compensatory damages first, and punitive damages second – but not before introducing his discussion of both by noting that Wal-Mart is "the largest retailer in the world[,]" that it had "net sales [of] 256 billion dollars[,]" and that while "Pat was outside collecting shopping carts ... the cash registers at Wal-Mart brought in 90 million dollars." *Id*. After this introduction, counsel summarized the qualitative nature of Brady's mental suffering, Tr. 959-62, and then suggested without any further analysis that an award of $26 million might – or might not – be "enough to repair the damage *and punish Wal-Mart for inflicting that*

*emotional distress*." Tr. 962 (emphasis added). He then proceeded to make a *separate* request for "90 million dollars in punitive damages" because "Wal-Mart's bad deeds must be punished." Tr. 964. On this record, even with an accurate instruction, I cannot discount the possibility that the jury's award of compensatory damages was at least somewhat punitive.

Accordingly, I cannot sustain the jury's award of compensatory damages. I need not order a new trial, however, because I find no other "prejudicial error" in the jury's verdict and may therefore make a new trial conditional on Brady's refusal of remittitur to the maximum award that would not be excessive. *See Ramirez*, 112 F.3d at 40-41; *Werbungs Und Commerz Union Austalt*, 930 F.2d at 1027-28. I therefore next consider what that amount might be, and conclude that it is $600,000.

Brady corroborated his claims of pain and suffering with testimony by family members who witnessed it and the psychiatrist who treated him for it. Neither is required to sustain an award of some compensatory damages, but the presence of both distinguishes this case from others that resulted in lower awards. *See City of Fulton*, 221 A.D.2d at 972 (reducing award of $50,000 to $10,000 because evidence of mental anguish from discriminatory treatment on the basis of disability was not corroborated); *State Office of Mental Retardation and Developmental Disabilities v. State Div. of Human Rights*, 183 A.D.2d 943 (N.Y. App. Div. 1992) (reducing an award of $75,000 to $7,500 because amount of award for mental anguish resulting from a termination on the basis of a disability was not reasonably related to wrongdoing and complainant was offered a comparable position).

Other cases seem more comparable. In *Sogg*, the jury awarded $1,125,000 in compensatory damages for mental anguish to a plaintiff who proved that she had been fired as a

67

result of unlawful discrimination on the basis of age, gender, and disability; the court later reduced that award to $400,000. N.Y. L.J., June 4, 1992, at 24. Over the course of her 27-year career as an employee of American Airlines Inc., Sogg had worked her way up to "second in command at La Guardia Airport," only to be denied a deserved promotion and ultimately terminated in violation of the NYHRL. *Id*. Sogg testified that the denial of promotion and termination caused her to suffer serious emotional injuries, and her psychologist testified that she "suffered a post-traumatic stress disorder as a result of her discriminatory discharge ... and continued to suffer the tearfulness, sleeplessness, lack of self-confidence, nervousness, and other aspects of the trauma." *Id*. Brady's career did not come to an end as a result of his employer's discrimination, as did Sogg's, but on the other hand Sogg's employer did not take an action that compounded a lifetime of trauma arising from a disabling condition. One case may be worse than the other, but reasonable minds could differ as to how to just how they compare.

Another case with somewhat comparable facts is *Cavagnuolo v. Baker & McKenzie*, 1993 WL 766865, at *1 (N.Y. Div. of Human Rights Dec. 17, 1993). The case concerned an attorney named Bowers who, while employed as an associate at the defendant law firm, consistently received positive performance reviews. After working at the firm for some time, Bowers was diagnosed with Kaposi's Sarcoma, an opportunistic infection related to AIDS that is considered a disability within the meaning of the NYHRL. *Id*. The disease produced purple lesions on Bowers's face that were noticeable to all – except, according to their testimony, to the partners in Bowers's law firm. Those partners testified that they did not know of Bowers's illness until he filed his complaint, and they insisted that they had terminated him for poor performance. *See id*. at *5. Their feigned ignorance is comparable to the similar feigned ignorance of Brady's

disability that the jury must have attributed to Wal-Mart's employees in finding that the company discriminated against him on the basis of a disability.

Bowers testified that he was "stunned" and "really upset" by his termination. *Id*. He testified that he "couldn't sleep at all," and that he "felt as though [the firm] had taken the last thing in the world that meant anything to [him]." *Id*. at *6. His testimony was corroborated by others who stated that he "cried often[,]" and that his job "gave him a sense of belonging, a sense of worth, the fact he could continue his job even though he had this deadly disease." *Id*. at *6-*7. In the Commissioner's view, the law firm's "discriminatory treatment of [Bowers] was devastatingly cruel. His psyche was punctured, his self-reliance was smashed, and his well-being was erased." *Id*. at *9. Taking into account all of the circumstances and the purpose of the Human Rights Law, the Commissioner concluded that an appropriate award was $500,000. *Id*. I personally would not say that the harm Wal-Mart inflicted on Brady was the same as the harm that Baker & McKenzie inflicted on Bowers, but I would hesitate to say that the difference is anything more than one of degree or that a reasonable person could not disagree with my comparison of the two cases.

Other cases involving discrimination have resulted in awards that were upheld without a finding that a reduction was needed to achieve the maximum amount that would not be excessive. Such cases provide some guidance, but only as to what is not excessive – not as to what is. *See Liska*, 213 A.D.2d 346 (upholding $95,000 compensatory damage award for discrimination on the basis of disability); *Allender v. Mercado*, 233 A.D.2d 153 (N.Y. App. Div. 1996) (upholding $100,000 compensatory damage award in employment discrimination); *Tiffany*

& *Co.*, 224 A.D.2d 332 (upholding $300,000 compensatory damage award for employment discrimination).

I find the *McIntyre* case to be instructive in a slightly different way. Like Brady, McIntyre suffered discrimination at the workplace – in her case, sexual harassment. McIntyre worked as a service representative in the defendants' garage, where she interacted with and processed the paperwork of customers who brought their cars in for repair. She testified "that while she was at work she was made to feel humiliated, intimidated and insignificant." N.Y. L.J., Nov. 21, 1997, at 25. Her psychologist testified that she "suffered from bad dreams, crying fits and loss of self-esteem" and that although her emotional condition improved after her termination because she was no longer in an abusive environment, she would remain "apprehensive about a reoccurrence at any new job and would suffer from anxiety about her performance." *Id*. Here again, reasonable minds can differ, but these facts suggest to me that McIntyre suffered harm that was comparable to, though milder than, that suffered by Brady. The jury awarded a total of $600,000 for McIntyre's emotional pain and suffering as well as $700,000 for a separate claim of intentional infliction of emotional distress. The trial judge reduced the total award to $650,000, which included $406,250 for the intentional infliction of emotional distress claim. The appellate division struck the latter award, leaving McIntyre with an award of $243,750 for pain and suffering. *See McIntyre*, 256 A.D.2d 269.

There is no definitively right answer here. For me to substitute my judgment for that of the jurors is to indulge a fiction that I am more capable than they of reaching a fair result. However, in light of the record that suggests at least a possibility that the jury in this case based its award on an impermissible blurring of the line between compensation and punishment, the

70

task falls to me to identify the greatest amount that would not be excessive. Taking into account the $300,000 award that was not excessive in the *Tiffany* case in 1996, the $400,000 that represented the maximum allowable award in *Sogg* in 1992, and the $500,000 award in *Cavagnuolo* that was not excessive in 1993, as well as the fact that the amounts awarded over a decade ago are worth far less now than they were then,[18] I conclude that the maximum amount that the jury could have awarded Brady without being excessive was $600,000.

For the reasons set forth above, I will grant Wal-Mart's motion for new trial solely to determine compensatory damages unless Brady accepts an award of $600,000 as compensation for his mental anguish. I direct Brady to notify me of his election no later than October 30, 2006.

IV.    Brady's Application For Attorneys' Fees, Other Costs, And Interest

Brady seeks an award of attorneys' fees and other costs totaling $956,386.92, as well as pre- and post-judgment interest on his damage awards. For the reasons discussed below, I find that Brady is entitled to an award of $644,145.22 for reasonable attorneys' fees and costs, that he is not entitled to pre-judgment interest on either his compensatory or punitive damage awards, and that he is entitled to post-judgment interest on the reduced amount of his total award from the date of judgment.

The parties have filed a number of briefs, affidavits, exhibits, and other papers in support of their respective positions on Brady's application for costs and fees, all of which I have

---

[18]    According to the federal government, the Consumer Price Index has risen some 43 percent since 1992, and about 28 percent since 1996; in the New York area, the increases have been even higher. *See* U.S. Dep't of Labor, Bureau of Labor Statistics, Consumer Price Index: All Urban Consumers (Current Series), http://data.bls.gov/cgi-bin/surveymost?cu (visited on Sept. 29, 2006).

considered, and many of which I cite in the following discussion. For ease of reference, I have collected all the abbreviations I will use into the following table:

| DE# | Abbreviation | Description |
|---|---|---|
| 115 | Fee App. | Plaintiff's Motion for Attorney Fees, Costs, and Pre- and Post- Judgment Interest |
| 116 | Fee Memo. | Plaintiff's Memorandum of Law in Support of Motion for Attorney's Fees, Costs, and Pre- and Post- Judgment Interest |
| 117 | Wigdor Fee Dec. I | Declaration of Douglas H. Wigdor dated June 27, 2005 |
| 117-3 | Fee Records I | Plaintiff's Invoice For Professional Services Rendered dated June 27, 2005 (Wigdor Fee Dec. I, Ex. B) |
| 117-4 | Costs Records I | Plaintiff's Expense Report October 7, 2004 - September 2, 2004 (Wigdor Fee Dec. I, Ex. C) |
| 117-7 | Tomlinson Dec. | Declaration of A. Kathleen Tomlinson dated June 23, 2005 (Wigdor Fee Dec. I, Ex. D)[19] |
| 117-8 | Brewington Dec. | Declaration of Frederick K. Brewington dated June 22, 2005 (Wigdor Fee Dec. I, Ex. E) |
| 126-1 | Kessel Dec. I | Declaration of I. Michael Kessel in Opposition to Plaintiff's Motion for Attorney's Fees, Costs, and Pre- and Post- Judgment Interest dated August 11, 2005 |
| 127 | Fee Opp. | Defendants' Memorandum of Law in Opposition to Plaintiff's Motion for Attorney's Fees, Costs, and Pre- and Post- Judgment Interest |

---

[19] The defendants' more specific objection to the relevance of fee awards in cases not involving civil rights claims is similarly unpersuasive. *See Farbotko v. Clinton County of New York*, 433 F.3d 204, 211 n.12 (2d Cir. 2005) (citing S. Rep. No. 94-1011, at 6 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5908, 5913) (Congress intended fee-shifting provision to compensate plaintiffs' counsel at rates equivalent to those prevailing "in other types of equally complex Federal litigation," including antitrust cases).

| DE# | Abbreviation | Description |
|---|---|---|
| 136 | Fee Reply | Plaintiff's Reply Memorandum of Law in Further Support of Motion for Attorney's Fees, Costs, Pre- and Post-Judgment Interest |
| 137 | Wigdor Fee Dec. II | Reply Affirmation of Douglas H. Wigdor dated September 1, 2005 |
| 137 | Fee Records II | Plaintiff's Invoice for Professional Services Rendered dated September 1, 2005 (Wigdor Fee Dec. II, Ex. A) |
| 137 | Cost Records II | Plaintiff's Expense Report June 27, 2005 - August 11, 2005 (Wigdor Fee Dec. II, Ex. B) |
| 137-3 | Gentile Dec. | Declaration of Virginia Gentile dated September 1, 2005 (Wigdor Fee Dec. II, Ex. H) |
| 161 | Wigdor Fee Dec. III | Declaration of Douglas H. Wigdor dated April 28, 2006 |
| 161 | Fee Records III | Plaintiff's Invoice for Professional Services Rendered dated April 27, 2006 (attached to Wigdor Fee Dec. III) |
| 161 | Cost Records III | Plaintiff's Expense Report August 19, 2005 - February 2006 (attached to Fee Records III) |

A.      The Availability Of Legal Fees

The ADA provides that a court may, "in its discretion ... allow the prevailing party ... a reasonable attorney's fee, including litigation expenses and costs...." 42 U.S.C. § 12205.  The purpose of such statutory fee shifting is to "encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel."  *Raishevic v. Foster*, 247 F.3d 337, 344 (2d Cir. 2001) (quoting *Kerr v. Quinn*, 692 F.2d 875, 877 (2d Cir. 1982)).  Accordingly, a prevailing party is presumptively entitled to recover attorney's fees absent "special circumstances [that] would render an award unjust." *Id*.

As a threshold matter, Brady is unquestionably a prevailing party entitled to some award of reasonable attorney's fees. A prevailing party is one who obtains direct benefit from an enforceable judgment that provides "relief on the merits" of the party's claim. *Farrar v. Hobby,* 506 U.S. 103, 111 (1992). After a six-day jury trial, Brady prevailed on ADA and NYHRL claims and won a $7.5 million dollar jury verdict in his favor. Although I have reduced the total award by almost 90 percent – eliminating $4.7 million of the original $5 million award of punitive damages, striking the award of $9,114 in back pay, and ordering remittitur of the compensatory damages award from $2.5 million to $600,000 – Brady's counsel has nevertheless won a substantial victory on his behalf.

Moreover, this is not the rare case in which the likelihood or ease of success rendered the case sufficiently attractive to prospective counsel that an award of attorney's fees is an unnecessary incentive. *See Raishevic*, 247 F.3d at 344. One of Brady's adversaries in this case is the world's largest retailer, an entity that enjoyed the advantages of having resources to defend the case that were, for all practical purposes, limitless. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.,* 396 F.3d 96, 101 (2d. Cir. 2005), *cert denied*, 544 U.S. 1044 (2005). Absent the possibility of fee-shifting, it is unlikely that Brady would have found counsel willing to prosecute his claim in light of the substantial time and resources required to litigate a civil rights claim against an opponent like Wal-Mart. An award of attorney's fees in this case thus furthers the legislative aim of providing individuals whose civil rights have been denied "effective access to the judicial process." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting H.R. Rep. No. 94-1558, at 1 (1976)).

Finally, although the defendants vigorously assail the amount of reimbursement that Brady seeks for his legal fees, they do not contest that he is a "prevailing party" for purposes of the statute. Instead, they have asked only that I defer ruling on the fee application until I have disposed of their motions under Rule 50 and Rule 59, to accommodate the possibility that those rulings might reverse Brady's victory at trial, but they offer no argument that Brady should be completely denied reimbursement of any legal fees in the event, which has now come to pass, that their motions produce no such reversal. *See* Fee Opp. at 1. I therefore turn to the consideration of a reasonable fee.

B.     Lodestar Calculations

My starting point is to use the "lodestar method" to arrive at an initial measure of reasonable attorneys' fees. *Hensley*, 461 U.S. at 424; *Luciano v. Olsten Corp.*, 109 F.3d 111, 115 (2d. Cir. 1997). Doing so entails a simple calculation: "The number of hours reasonably expended on the litigation is multiplied by a reasonable hourly rate for attorneys and paraprofessionals." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992). District courts have broad discretion to determine both the reasonable number of compensable hours and the reasonable hourly rate. *See Hensley,* 461 U.S. at 433, 437. Fee awards are reviewed for abuse of discretion. *See Farbotko*, 433 F.3d at 208.

Throughout this litigation, Brady has been represented by the law firm of Thompson Wigdor & Gilly LLP ("TWG"), a small New York City law firm comprised, during the relevant period, of three partners and seven associates. TWG submitted an application for attorneys' fees that includes contemporaneous time records and declarations as to the reasonableness of the rates sought. Pursuant to that application, Brady seeks a total of $908,537 for 2,595.1 hours. *See* Fee

Records I ($804,187 for 2300.6 hours); Fee Records II ($80,460 for 228.6 hours); Fee Records III ($23,890 for 65.9 hours).

1.      The Lodestar Hourly Rates

In determining a reasonable hourly rate for Brady's attorneys, I must look to the "prevailing market rate" in the community "for similar services by lawyers of reasonably comparable skill, experience, and reputation. " *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984); *Luciano*, 109 F.3d at 115. The relevant community for such purposes is the district in which the action was commenced and litigated. *Luciano*, 109 F.3d at 115-16. In exceptional cases requiring the "special expertise" of non-local counsel, a court can apply the higher rate of counsel's home forum. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, 369 F.3d 91, 96 (2d Cir. 2004) (per curiam) (quoting *In re "Agent Orange" Product Liability Litigation*, 818 F.2d 226, 232 (2d Cir. 1987)). The specific rate that is reasonable for a given attorney depends on such factors as the attorney's experience and expertise, the novelty and complexity of the issues presented, and the overall success achieved in the case. *Luciano*, 109 F.3d at 116. Rates awarded to attorneys of comparable skill in prior cases are relevant to the issue of what rate is reasonable in a given case, but it is not the only evidence I can consider; indeed, I must consider any credible evidence that Brady submits in advocating a higher prevailing rate. *Farbotko*, 433 F.3d at 209-10. Only in the absence of such evidence may I restrict my analysis to prior decisions on the matter. *Id*.

Brady asks me to award fees based on the following hourly rates for his attorneys and their paralegal assistants:

| | | |
|---|---|---|
| Douglas H. Wigdor ("Wigdor") | (partner) | $450.00 |
| Scott B. Gilly ("Gilly") | (partner) | $450.00 |
| Kenneth P. Thompson ("Thompson") | (partner) | $450.00 |
| Michelle M. le Roux ("le Roux") | (associate) | $300.00 |
| Andrew S. Goodstadt ("Goodstadt") | (associate) | $350.00 |
| James C. Mallios ("Mallios") | (associate) | $325.00 |
| Jeffrey A. Dougherty ("Dougherty") | (associate) | $265.00 |
| Key A. Mendes ("Mendes") | (associate) | $300.00 |
| Kathryn Webber ("Webber") | (associate) | $350.00 |
| Renan F. Varghese ("Varghese") | (associate) | $250.00 |
| Jillian D. Howell ("Howell") | (paralegal) | $100.00 |
| Mayerling R. Sanchez ("Sanchez") | (paralegal) | $100.00 |

*See* Fee Records I at 58; Fee Records II at 6; Fee Records III at 6. Wigdor asserts that these are the customary rates his firm charges clients in its employment litigation practice and that they are consistent with those charged by comparable Manhattan-based firms. Wigdor Fee Dec. I ¶ 8.

The defendants fault Brady's attorneys for claiming such "stratospheric" rates, and propose the following alternatives, which they contend more precisely reflect the relevant prevailing rates in this district:

| | | |
|---|---|---|
| Wigdor | (partner) | $225.00 |
| Gilly | (partner) | $225.00 |
| Thompson | (partner) | $225.00 |
| le Roux | (associate) | $200.00 |
| Goodstadt | (associate) | $200.00 |
| Mallios | (associate) | $175.00 |
| Dougherty | (associate) | $175.00 |
| Mendes | (associate) | $200.00 |
| Webber | (associate) | $200.00 |
| Howell | (paralegal) | $50.00 |

Fee Opp. at 5, 7, 12. The defendants did not suggest specific rates for Varghese and Sanchez, neither of whom was mentioned in Brady's initial fee application.

a.     The Relevant Community

Brady asks that I look to rates prevailing in the Southern District of New York for purposes of the lodestar because both of the law firms that appeared in this case are located in New York City, several depositions took place in the Manhattan offices of these law firms,[20] and because Brady's case was specifically referred to TWG by local counsel who felt that the firm was uniquely qualified to handle the instant case.  Fee Memo. at 22-23; Fee Reply at 2-3; Wigdor Fee Dec. II ¶ 3.  I do not find that there are sufficiently exceptional circumstances present here to justify the application of non-forum rates.  While Wigdor asserts that his firm was better equipped than local counsel to handle this case, he has not made the requisite showing that this case required any special expertise or that no local counsel was willing to take the case.  *See Arbor Hill*, 369 F.3d at 96-97.  On that score, I note that there are a number of established, competent civil rights attorneys in this district with the expertise to have litigated Brady's discrimination claims.

b.     The Lodestar Hourly Rate For Partners

Wigdor was the primary partner on this case.  He has just over ten years experience practicing law and was a founding partner of TWG.  His impressive academic and professional achievements establish that he is an experienced labor lawyer and an expert in his field.  He has litigated discrimination and other employment-related claims for major corporate clients, his writing has been published in several scholarly and professional journals, and he has made

_____

[20]  In addition, part of the trial proceedings in this case took place in Manhattan.  To avoid wasting the jury's time, I met with trial counsel on a federal holiday for a charge conference at the offices of Brady's attorneys, as doing so was more convenient for all concerned than traveling to the courthouse in Central Islip, where the case was tried.

multiple appearances as a labor law expert in the lay media. Wigdor Fee Dec. I ¶¶ 72-82. I further note that Wigdor capably represented Brady and achieved a notable and indisputable success for his client – namely, a $7.5 million jury verdict against a major corporate defendant. That I have reduced the jury's award as described above does not diminish the success of Wigdor's efforts.

Wigdor offers the following as evidence of the reasonableness of the $450 hourly rate he requests: his own affirmation that the rate is what he customarily charges the clients who retain his services; sample retainer agreements; affirmations from two prominent local attorneys who specialize in civil rights and employment law attesting to the reasonableness of the rate he proposes; and a number of decisions from the Southern District of New York awarding prevailing plaintiffs comparable rates. Fee Memo. at 6-10; Wigdor Fee Dec. I ¶ 8; Tomlinson Dec.;[21] Brewington Dec. The defendants challenge the various affirmations as unreliable and argue that the cited cases are irrelevant since the relevant forum is the Eastern District and the rates cited were awarded to attorneys with considerably more experience than Wigdor, Gilly, and Thompson. Fee Opp. at 3-12.

As a threshold matter, I must consider the relevance of the cases from outside this district on which Brady relies. In each such case, a judge in the Southern District of New York approved hourly rates that were nearly comparable to those sought here, or even (in cases outside the civil rights context) higher. The defendants correctly note that, absent special circumstances, the

---

[21] The Honorable A. Kathleen Tomlinson submitted her declaration prior to being selected for appointment as a magistrate judge in this district, which position she has since assumed. Neither party has suggested that Judge Tomlinson's appointment as my colleague presents any reason for me either to disregard her declaration or to give it any greater or lesser weight. Accordingly, I treat it like any other submission.

relevant community for purposes of establishing a lodestar rate is the forum district.  *See Arbor Hill*, 369 F.3d at 96.  That precept, however, does not mean I must ignore other available information that might also be informative; indeed, controlling precedent is to the contrary.  *See Farbotko*, 433 F.3d at 206, 209-10 (remanding case to district court for consideration of any credible evidence submitted by plaintiffs as to the prevailing rate, including information about fee awards from other districts).  Thus, the decisions on which Brady relies cannot be dispositive, but I must nevertheless consider them.  *See New Leadership Comm. v. Davidson*, 23 F. Supp.2d 301, 304 (E.D.N.Y. 1988) (recognizing judges in this district have "broad discretion" to consider the rates charged by lawyers practicing in the Southern District of New York).

How to weigh the results in such cases is another matter.  In most of the cases Brady cites, the attorneys had significantly more experience than Wigdor, Gilly or Thompson – indeed, some had more than all three of the partners representing Brady combined.  *See Kuper v. Empire Blue Cross and Blue Shield*, 2003 WL 23350111, at *9 (S.D.N.Y. Dec. 18, 2003) (awarding $425 instead of the $450 per hour requested to pre-eminent labor lawyer who had authored two books on job-discrimination litigation and had over 35 years of experience primarily in the field of employment discrimination); *New York State Nat'l Org. for Women v. Pataki*, 2003 WL 2006608, at *2 (S.D.N.Y. Apr. 30, 2003) (awarding rates of $430 and $400 per hour, respectively, to attorneys with more than 30 years of experience in civil rights and employment law); *Skold v. Am. Int'l Group, Inc.*, 1999 WL 405539, at *7 (S.D.N.Y. June 18, 1999) ($400 per hour rate awarded to preeminent employment lawyer with more than 30 years of experience).  For attorneys with comparable experience to Gilly, courts in the Southern District have awarded fees at rates ranging from $250 to $300.  *See Marisol A. ex rel. Forbes v. Giuliani,* 111 F.

Supp.2d 381, 386-87 (S.D.N.Y. 2000); *Access 4 All, Inc. v. Park Lane Hotel, Inc.,* 2005 WL 3338555, at *5 (S.D.N.Y. Dec. 7, 2005).

Firm size also matters, and the defendants rightly point out the difference between the large firms that represented prevailing parties in some of the cited cases and the smaller office that represents Brady. *See Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053 (2d Cir. 1989); *Murray ex rel. Murray v. Mills,* 354 F. Supp.2d 231, 236 (E.D.N.Y. 2005) (noting that hourly rates tend to be higher at large firms to compensate for higher overhead costs). While Brady's attorneys say they maintain an office on Fifth Avenue in Manhattan with overhead comparable to that of large firms in the same area, I find that to be an insufficient reason to adopt a lodestar hourly rate of $450 or more as was done in the cases they cite. *See* Fee Memo. at 7-8 (citing *Ursa Minor Ltd. v. Aon Fin. Prods., Inc.*, 2001 WL 1842042, at *7 (S.D.N.Y. May 30, 2001); *Bianco v. Erkins*, 284 B.R. 349, 352 (S.D.N.Y. 2002)).

For obvious reasons, recent fee awards in this district are more relevant than those elsewhere, and the defendants correctly point out that an hourly rate of $450 is well above what courts in this district have awarded to prevailing civil rights attorneys from small firms. Fee Opp. at 9. The most recent example of such a decision by the Second Circuit – some eight years ago – cited $200 for partners and $135 for associates as reasonable hourly rates for legal services in this district. *See Savino v. Computer Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998). More recent district court decisions in civil rights cases have awarded fees based on higher hourly rates for partners, ranging from $225 to $300. *See Levy v. Powell*, 2005 WL 1719972, at *9 (E.D.N.Y. July 22, 2005) (citing cases). As far as I can determine, the highest such fee was approved for "an experienced trial attorney with many years of experience before the federal bar" who was

described as "accomplished ... in the practice of civil rights law." *Duke v. County of Nassau*, 2003 WL 23315463, *2 (E.D.N.Y. Apr. 14, 2003). In the context of complex commercial litigation, a judge of this court has approved as reasonable hourly rates of up to $375. *General Motors Corp. v. Villa Marin Chevrolet, Inc.*, 240 F. Supp.2d 182, 188 (E.D.N.Y. 2002).

Some of these decisions determined the "prevailing rate" on the basis of precedent rather than empirical inquiry. *See, e.g., Levy*, 2005 WL 1719972, at *9; *Fink v. City of New York*, 154 F. Supp.2d 403, 407 (E.D.N.Y. 2001). *Farbotko* precludes me from doing the same here because Brady has submitted empirical evidence of prevailing rates in addition to the decisions in prior cases. *See* 433 F.3d at 209-10. I find that evidence credible, although it does not compel the conclusion Brady urges. Specifically, I credit Wigdor's assertion, as supported by sample retainer agreements, that his customary hourly rate is $450. Wigdor Fee Dec. I ¶ 8; Brewington Dec. I also credit the declarations by his colleagues on Long Island, both of whom have or had established practices representing parties in complex federal litigation in the Long Island area, about the prevailing rates for such services in this district. Tomlinson Dec. ¶¶ 3, 9; Brewington Dec. ¶¶ 1, 6. Tomlinson also avers that the rates in Brady's application are commensurate to the hourly rates ranging from $350 to $550 that her erstwhile law partners charged, and I infer from that evidence that the requested rate is similar to that charged by at least some other firms in this district. Tomlinson Dec. ¶¶ 3, 10.

The fact that TWG is located in Manhattan limits the relevance of the firm's customary rates to the issue of identifying the prevailing rates in this district. *See Levy*, 2005 WL 1719972, at *10 (customary rate of an out-of-state attorney not probative as to prevailing rate in forum district). Likewise, the Brewington and Tomlinson declarations, while credible, have only

limited relevance. For example, evidence that the partners at Judge Tomlinson's former law firm charge high hourly rates has only limited relevance given the much larger size of that office – 70 attorneys – compared to TWG. *See* Tomlinson Dec. ¶¶ 1, 10. Thus, while I have considered Brady's empirical evidence about the prevailing rate in the relevant community, I find it provides little guidance in determining whether to approve a rate that exceeds the benchmark of recent decisions.

In light of Wigdor's demonstrated skill and the success he has achieved in this case, I find sufficient circumstances present to justify compensating him at a rate that is at the high end of those prevailing in this district. However, I find $450 to be well above the rates prevailing in this district for attorneys of Wigdor's experience. I find that $350 per hour is a reasonable rate for the services Wigdor provided. Likewise, I find $350 per hour to be a reasonable rate for the services of Gilly and Thompson, both of whom are, like Wigdor, founding members of TWG and experienced trial attorneys who contributed to Brady's success in this case.

c.  The Lodestar Hourly Rate For Associates

Goodstadt and Webber are both senior associates with over seven years experience practicing law. Wigdor Fee Dec. I ¶¶ 103-04, 108. In light of the prevailing rates for senior associates in this district as demonstrated by prior case law, which I do not find to be controverted by any of the submitted evidence, the attorneys' experience, and the already noted success achieved, I find that $225 per hour is a reasonable rate for their services. *See Duke*, 2003 WL 23315463, at *3 (awarding $250 to a senior associate with twelve years of experience).

Le Roux, Mallios, Dougherty, and Mendes are all mid-level associates, each of whom has approximately five years of experience, with the exception of Mallios, who has three. Wigdor

Fee Dec. I ¶¶ 92, 105-07. Varghese is a junior associate, with less than one year of experience. Wigdor Fee Dec. III ¶ 4. I find that a rate of $200 per hour is reasonable for the services of le Roux, Dougherty and Mendes. Given their more junior status, I find that $175 is a reasonable hourly rate for Mallios, and that $150 is reasonable for Varghese. *See Duke,* 2003 WL 23315463, at *3 (awarding hourly rates of $200 and $175 to mid-level associates, and $150 to a "recent law school graduate with little experience").

d.      The Lodestar Hourly Rate For Paralegal Staff

I find that the $100 per hour rate requested for paralegal staff is reasonable in light of recent fee awards. *See Grand Street Realty, LLC v. McCord,* 2005 WL 2436214, at *12 (E.D.N.Y. Sept. 30, 2005). Therefore, I will use this rate in the lodestar calculation for Howell and Sanchez.

2.      The Lodestar Hours

Just as a lawyer in private practice may not bill a client for hours not reasonably spent on the client's case, a lawyer may not so bill his adversary. *Hensley*, 461 U.S. at 434. To ensure a reasonable fee award, I must review the claimed hours and eliminate from the lodestar calculation those that I find to be "excessive, redundant, or otherwise unnecessary." *Id*. In so doing, I am guided by the admonition that "[e]fforts put into ... the preparation of a case can expand to fill the time available, and some judgment must be made in the awarding of fees as to diminishing returns." *Murray*, 354 F. Supp.2d at 238 (quoting *Gierlinger v. Gleason*, 160 F.3d 858, 876 (2d Cir. 1998)). District courts have broad discretion to determine the reasonableness of hours claimed based on their general experience and "familiarity with the case," *id*., and may employ a variety of practical methods for "trimming fat" from an excessive fee application, such

as "across-the board percentage cuts." *In re "Agent Orange"*, 818 F.2d at 237-38. Such methods

can be applied to specific attorneys, or to specific stages of the litigation. *See*, *e.g.*, *Levy*, 2005

WL 1719972, at *8-*9 (reducing the requested hours of individual attorneys by 35 percent and

10 percent, respectively, for such factors as vagueness, excessiveness, redundancy, and

duplication among attorneys); *Murray*, 354 F. Supp.2d at 238-41 (dividing the plaintiff's billing

statement into four stages and reducing the requested hours substantially within each category by

replacing the total hours with the number of hours the court determined was reasonable for the

task).

An application for attorneys' fees must be accompanied by contemporaneous time records

documenting "the number of hours worked and the matters involved." *McCann v. Coughlin*, 698

F.2d 112, 131 (2d Cir. 1983). Such records need not provide a minute-by-minute accounting of

each attorney's work, but they should identify the "general subject matter" of expenditures.

*N.Y.S. Teamsters Conference Pension & Retirement Fund v. United Parcel Serv., Inc.*, 2004 WL

437474, at *3 (N.D.N.Y. Feb. 27, 2004) (quoting *Hensley*, 461 U.S. at 437 n.12) By submitting

such documentation, a fee applicant renders less speculative the court's task of assessing the

reasonableness of the claimed hours. *McCann*, 698 F.2d at 130.

Brady supports his claim with 70 pages of contemporaneous billing records that

document the 2,595.1 hours that TWG staff spent on Brady's case from September 17, 2002,

when Gilly first met with Brady to discuss his grievances, to the final submission on the matter

on April 28, 2006. Although the defendants complain that "block billing" in several entries

makes it impossible for them to calculate the precise number of hours spent on certain tasks, they

do not challenge the sufficiency of the records. Fee Opp. at 20. I find the submitted records to be more than adequate.

The defendants argue that the total number of hours claimed in Brady's fee application is "highly unreasonable." Fee Opp. at 15. They urge me to downwardly adjust the plaintiff's fee application as follows: (1) a 20 percent reduction in total claimed hours for unsuccessful claims; (2) a 35.6 hour reduction for a failed discovery motion; and (3) a 30 percent reduction in total hours for unnecessary and duplicative charges incurred at each step of the litigation. *Id*. at 12-21. In all, the defendants would have me reduce the total lodestar hours by more than half – from over 2,500 to 1,133. *Id*. at 21. Brady responds that the time claimed by his attorneys is neither excessive nor unreasonable. Fee Reply at 8.

To help get a feel for the amount of time that attorneys presumably more reasonable than Brady's would have spent litigating this case, I asked the defendants' counsel to provide me with information about their own work on the case. The result, given the sharp rhetoric that preceded my request, was surprising: far from having conducted this litigation more efficiently, the defendants' attorneys logged hours working the case that dwarfed those of Brady's attorneys. Indeed, as far as I can discern from a comparison of both camps' contemporaneous billing records, at almost every step of this litigation the defendants' attorneys invested as much or more time on behalf of their clients as the attorneys of TWG did on behalf of theirs. Such a comparison, of course, is of limited utility: in the remainder of my analysis, I therefore take into account the possibility that counsel on both sides needlessly multiplied their work hours.

Considered in the aggregate and without reference to the hours billed by opposing counsel, the claimed hours do appear high. Brady does not cite, and I have not come across, a

comparable case in which a court compensated a prevailing plaintiff for as many hours as counsel here request.[22]  Although each case is obviously unique, cases involving similar claims that resulted in jury trials of similar length are instructive.  In *O'Grady v. Mohawk Finishing Prods., Inc.*, the plaintiff prevailed on his ADA and state law disability wrongful termination claims after a four-day jury trial. 1999 WL 30988, at *1 (N.D.N.Y. Jan. 15, 1999).  The court deemed the 1900 hours requested in the plaintiff's fee application to be "highly unreasonable" and reduced the total hours by 40 percent after first excluding from the lodestar several categories of unnecessary and excessive hours.  *Id*. at *5.  In *Kuper*, the plaintiff prevailed on his state law and ADA claims after a 5-day jury trial.  2003 WL 23350111, at *1.  There, the district court, after making minor reductions to the plaintiff's requested hours, awarded the plaintiff fees for a total of 1322.9 hours. *Id*. at *11-*14.  That both sides in this case claim to have worked considerably more hours than the number deemed reasonable in prior cases tells me either that the attorneys here were inefficient or that the prior cases are not reasonably comparable to the complex litigation demands the attorneys here encountered.

My task here is not to engage in an "*ex post facto* determination of whether attorney hours were necessary to the relief obtained."  *Grant,* 973 F.2d at 99.  It would be impossible and improper to attempt in hindsight to identify the minimum level of effort that Brady's counsel could have expended to achieve the same result.  Therefore, the sheer number of hours billed suggests very little about the reasonableness of the claimed hours.  On the other hand, the fact

---

[22] Brady does claim that awards from similar cases justify the fee award he requests.  *See* Fee Memo. at 21-22.  However, he offers only a list of cases in which courts awarded fees at the rate requested and never cites any comparable cases in support of the reasonableness of the hours or total fee award sought.

that the defendants' counsel spent more time on this case than TWG suggests that the latter's hours may well have been not only reasonable, but quite necessary.[23]

Brady identifies several factors that made this a difficult and time-consuming case to litigate. Brady first notes that the nationwide Consent Decree in effect at the time of the conduct at issue in this litigation occurred raised "novel and intricate legal issues." Fee Memo. at 18. I do not completely agree. The Consent Decree ultimately played a very limited role in the case and in my view did not render this case inherently more novel or complex than a standard discrimination claim. On the other hand, once Brady's counsel made the decision to try to wring from the Consent Decree its limited probative value, which decision I do not second-guess, it is apparent that his adversaries – possibly due to a similar overestimation of its significance – took great pains to litigate the decree's admissibility. Brady thus bears some responsibility for making the parties spend time litigating about the Consent Decree's use at trial, but I do not lay blame at his door for the fact that the amount of time became so great.

I am more sympathetic to Brady's contention that this case presented a unique challenge due to the identity of his adversary. Brady notes that Wal-Mart was a "formidable opponent"

---

[23] I also consider, though possibly not precisely in the manner anticipated, Wigdor's appeal to the fact that the small size of his firm meant that the hours he and his colleagues worked on this case represented a greater burden for TWG than a corresponding workload would for a larger firm. Wigdor asserts, and I accept, that TWG necessarily passed up opportunities to represent clients in other matters because of the resources it devoted to this case. *See* Wigdor Fee Dec. I ¶ 71. That fact does not relax the standard for assessing the amount of hours TWG claims here. However, it does suggest a stronger reason to think, all other things being equal, that the standard has been met. A small firm – and particularly a relatively new one such as TWG – has a particularly strong incentive to be as sparing as it responsibly can be in working on one case so that it does not needlessly turn down another. Because TWG – unlike the firm representing the defendants – had to devote resources to litigating this case before it could know whether, or how much, it would be paid, it would have had a strong incentive at the time the work was done to make responsible choices. That incentive necessarily inures to Wal-Mart's benefit now.

with "considerable assets and resources at its disposal" with which to defend the action. *Id.* at 19. Having seen the litigation in this case as well as in others involving similar claims, I have no doubt that the burden of prosecuting a discrimination claim against Wal-Mart was inevitably greater than it would have been had the defendant been a much smaller employer. As evidenced by Wal-Mart's many motions, the defendants used their considerable resources to mount an extremely aggressive, albeit largely unsuccessful, defense.[24] As another court has aptly written,

> At every stage of the proceeding, the ... [d]efendants' lawyers, as was their right and professional duty, aggressively challenged [the plaintiff's] claims. In so doing, they displayed a fierceness matched in its intensity only by the double shock they now profess at the number of hours [plaintiff's] attorneys assert they devoted to this case.

*Gonzalez v. Bratton*, 147 F. Supp.2d 180, 211 (S.D.N.Y. 2001).

The overall characteristics of Brady's billing records are thus an insufficient basis on which to assess the claim for lodestar hours. I next turn to an examination of several distinct categories of charges that the defendants characterize as "unnecessary and duplicative." Fee Opp. at 21. Considering these hours as a whole, the defendants argue that I should reduce them by 30 percent reduction for purposes of determining the lodestar. *Id*.

> a.     <u>Depositions</u>

The defendants contend that Brady's counsel consistently over-billed for depositions. *Id*. at 16-17. Most of the cited instances of such purported over-billing are accounted for by the fact that the defendants compared the total hours billed for a deposition, which often included preparation time, with the length of the deposition alone. For example, the defendants note that

---

[24]   For example, the defendants made an unsuccessful motion for summary judgment and four unsuccessful motions *in limine*.

Brady's attorneys billed eleven hours for the 7.5-hour deposition of defendant Chin. The relevant time entry clearly indicates that the eleven hours included preparation time. *See id*.; Fee Records I at 15. They also claim, without citation to any legal authority, that it was inappropriate for partners to bill time spent preparing witnesses at the full partner rate. Fee Opp. at 17. On that score, I note that in many instances the two sides logged very similar hours and I found nothing inherently unreasonable about the hours based on my own knowledge of the case. Accordingly, I find the hours associated with depositions to be reasonable.

b.     Summary Judgment Motion

The defendants deem "inordinate" the 200 hours in total that Brady's attorneys spent in their successful effort to oppose the summary judgment motion. *Id*. I agree that this is an unreasonable amount of time for experienced attorneys to spend opposing a motion that did not raise new or complex legal issues. *See Anderson v. Rochester-Genesee Regional Transp. Auth.*, 388 F. Supp.2d 159, 164-65 (W.D.N.Y. 2005) (net 20 percent reduction in lodestar hours based in part on 140 hours spent on a routine summary judgment motion). While the amount of time was similarly high on both sides, the defendants' inefficiency does not require them to pay for Brady's. I will make a 10 percent reduction in the hours sought for this task.

The defendants also contest the approximately 28 hours that Brady's counsel billed for preparing a three-page response to the defendant's request for a pre-motion conference. Fee Opp. at 18. As Brady correctly notes, this response required comprehensive legal research and factual analysis. While I would have expected that this initial investment of 9.7 partner hours and 19 associate hours in research and analysis at this early stage would have resulted in greater

efficiency in responding to the motion that followed, I have already made an adjustment for the latter inefficiency and need not do so again here.

c.   Fee Litigation

Brady's counsel spent a surprisingly high number of hours –  257 – on fee litigation. *See* Fee Opp. at 18; Fee Records I at 49-57; Fee Records II; Fee Records III.  The defendants' charge of excess in this context seems somewhat misplaced in light of their own contributions to the time spent disputing even minor matters.  Those efforts included not simply opposition to Brady's application, but also surprisingly vigorous litigation arising from my request for information that would help me decide the issue.  *See*, *e.g.*, DE 149; Endorsed Order dated December 29, 2005.

Nevertheless, I would be remiss if I did not trim some of the fat from Brady's fee application in light of the clear excessiveness of the billing for its preparation.  I will reduce by half the lodestar hours for this task.  *See Murray*, 354 F. Supp.2d at 241 (citations omitted) (noting that even in a complex case a fee application should only take about 30 hours); *Levy*, 2005 WL 1719972, at *8 (justifying an across-the-board 35 percent reduction in part on the 101.3 hours billed for the fee application).

d.   Initial Disclosures And Discovery Requests

The defendants also challenge as excessive the 36 hours it took Brady's counsel to draft initial discovery requests and initial disclosures, which included 22 interrogatories and 85 document requests.  Fee Opp. at 18.  I agree.  Such tasks should not take an experienced lawyer nearly an entire work week to complete, and I doubt that such a lawyer would charge a paying client for so much time even if it did.  Brady's counsel logged an equivalent number of hours drafting responses to the defendants' initial discovery requests and I likewise find this to be

an excessive amount of time for that task. I further note that these discovery tasks were among the few for which Brady's counsel logged more hours than their adversaries. I will reduce the lodestar hours for these tasks by 30 percent.

e. Mediation

Defendants charge that Brady's counsel unreasonably spent 62 hours preparing for and sixteen hours attending the court-ordered mediation. *Id*. I agree that the preparation time was excessive, particularly in comparison to the hours logged by opposing counsel, which were less by half. While I appreciate that counsel had to prepare lengthy statements, I do not think that this should have required 62 hours. With regard to the actual mediation session, I do not agree with the defendants that it was inherently unreasonable for Brady to be represented by two attorneys at the mediation session. Wal-Mart was similarly represented by two attorneys. I recognize that one of Wal-Mart's attorneys was in-house counsel for whom legal fees were not incurred, and who also had a role as client that the second lawyer representing Brady did not. Nevertheless, a mediation presents challenges that a deposition or a routine court proceeding might not; I cannot say that it was unreasonable for Brady to have two lawyers present. Accordingly, I will leave untouched the hours billed for attending the mediation session but reduce the preparation hours by half.

f. Trial Preparation

Brady's attorneys logged an enormous 407 hours of work for trial preparation. *Id*. Their counterparts on the defendants' side nevertheless outpaced them. I am particularly loath to tell either side that its lawyers worked too hard in this context. Preparedness is the hallmark of a good trial attorney, as both sides amply demonstrated. Nor was the trial in this case a simple one.

92

Brady's counsel prepared to examine 20 potential witnesses, opposed four motions *in limine*, prepared 50 trial exhibits, and drafted substantial jury instructions. Fee Reply at 7 n.11; Wigdor Fee Dec. I ¶¶ 53, 54, 59-60. I do find it appropriate, however, to eliminate from the lodestar Gilly's trial-related hours. The appearance of a third attorney, in particular a high-priced partner, was redundant and unnecessary. I will therefore eliminate the 15.5 hours that Gilly billed in connection with his appearance in the courtroom during the trial. *See* Fee Records I at 46-48.

### g.    Post-Trial Litigation And Miscellaneous Hours

The defendants identify a laundry list of post-trial and other miscellaneous charges that they deem redundant, excessive, or unnecessary. Fee Opp. at 19-20. Of the 119.6 hours challenged, I agree with defendants with respect to 58.1 of those hours,[25] and will eliminate the improper hours billed by Wigdor, le Roux, Gilly, Dougherty, and Webber accordingly. For example, the defendants correctly object to being asked to pay for 7.5 hours that Brady's attorneys spent meeting with their client after trial and soliciting potential *amicus* briefs. Taking a victory lap is perfectly understandable, as is the search for allies, but the law does not require a losing party to subsidize either.

### h.    Summary Of Reductions

In sum, I have identified a total of 190.4 excessive hours in the plaintiff's fee application. Leaving aside the 15.5 hours for Gilly's trial time and the 58.1 hours of post-trial charges, the excessive hours represent 7.34 percent of the total hours requested. Therefore, I will reduce each

---

[25] I disagree with defendants' challenge to 88 hours of "generalized 'research.'" Fee Opp. at 19. Of those hours, 7.5, billed by le Roux on May 26, 2005, were included in defendants' challenge to 153 hours billed for fee litigation. *See id*. at 18-19; Fee Records I at 9. I therefore exclude them from the hours billed in this context.

attorney's hours by this percentage: I will reduce Gilly's lodestar hours by an additional 16.8,

Wigdor's by 18.4, le Roux's by 39.9, Dougherty's by 1.5, and Webber's by 0.7.

       3.     <u>Lodestar Adjustments</u>

           a.     <u>Brady's Request For An Upward Adjustment</u>

Brady urges me to upwardly enhance the lodestar award by an unspecified amount based

on the following factors:

> (1) time and labor required; (2) the novelty and difficulty of the question
> presented; (3) the skill required to perform the legal service properly; (4) the
> preclusion of employment due to the acceptance of the case; (5) the customary
> fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the
> client or the circumstances; (8) the amount of time involved and the results
> obtained; (9) the experience, reputation, and ability of the attorneys; (10) the
> undesirability of the case; (11) the nature and length of the professional
> relationship with the client; and (12) awards in similar cases.

Fee Memo. at 11. These factors are all relevant to the calculation of attorney's fees, but not in the

way that Brady suggests. The lodestar rate and hours should reflect these factors. Absent

extraordinary circumstances, the resulting calculation should not be adjusted. *See Blum*, 465

U.S. at 898-99. In this circuit, the circumstances are rare in which a properly calculated fee

award can be upwardly enhanced and such enhancements are essentially proscribed in fee-

shifting cases. *See Loper v. New York City Police Dep't*, 853 F. Supp. 716, 722 (S.D.N.Y. 1994)

(concluding, based on a thorough analysis of controlling post-*Hensley* case law, that

"enhancements under fee shifting cases are no longer permissible in this circuit"). There appear

to be two very limited exceptions to the rule: enhancements may be permitted in cases involving

"excessive delay" and, on "public policy" grounds, in cases "worthy of judicial encouragement."

*Id*. at 722-23 (citations omitted). Downward adjustments are permitted in cases where parties

only achieve a "partial success." *Id*. Neither of the two enhancement exceptions is applicable here.

First, the delay exception only applies to cases involving "protracted litigation." *See Grant v. Bethlehem Steel Corp.*, 973 F.2d 96, 100 (2d Cir. 1992). Although Brady asserts that there was sufficient delay to justify a fee enhancement, *see* Fee Reply at 9, this case has been pending for little over three years – which is more than a decade less than the fifteen years of litigation that prompted the enhancement in *Grant*. *See id*. Furthermore, under *Grant*, the proper way for the court to account for a delay is to apply a current rate to historical hours. *Id*. This has already been accomplished since I have used current rates in the lodestar in accordance with the law of this circuit. *See Farbotko,* 433 F.3d at 211 n.11.

Brady next argues that because the large jury verdict generated considerable media attention and interest from advocacy groups, his case is likely to encourage others to vindicate their rights through the courts. On this basis, Brady argues that the case "served the public interest and is worthy of judicial encouragement." Fee Reply at 9. I disagree. Policy enhancements have only been upheld in equitable fund cases and are likely only permissible in that context. *See Loper,* 853 F. Supp. at 723; *In re "Agent Orange"*, 818 F.2d at 234-36 (upholding "quality multiplier" in an equitable fund case in part because of the greater discretion district courts have to award enhancements in equitable fund cases versus statutory fee-shifting cases). To the extent that such an exception does remain and is applicable in a fee-shifting case, it would nonetheless not be warranted here. Brady's attorneys have achieved a success, but not, in my view, the kind of "exceptional success" that makes an enhancement to the lodestar calculation either necessary or appropriate. *See Hensley*, 461 U.S. at 435.

b.     The Defendants' Request For A Downward Adjustment

The defendants argue that I must exclude from the lodestar those hours Brady's counsel spent on two of Brady's unsuccessful claims and a failed discovery motion. Fee Opp. at 14-15. Brady counters that he is entitled to a fee award reflecting all of the hours spent on the litigation since the case overall was a success and the unsuccessful claims are interrelated with the successful ones. Fee Reply at 6-7; Fee Memo. at 13-16.

The overall success of the case is an important benchmark against which any fee award must be assessed. *Hensley*, 461 U.S. at 434. Where a nonetheless prevailing plaintiff achieves only nominal or minimal success, a reduction to the lodestar is appropriate. *See Levy*, 2005 WL 1719972, at *12 (reducing the requested lodestar by 25 percent because the plaintiff only prevailed on one cause of action); *Separ v. Nassau County Dep't of Soc. Servs.*, 327 F. Supp.2d 187, 192 (E.D.N.Y. 2004) (reducing the lodestar by 40 percent owing to the plaintiff's several dismissed claims and "limited success").

Likewise, a reduction may be appropriate where a prevailing plaintiff is unsuccessful on certain claims. The Supreme Court instructs that in such cases the lodestar should only be reduced for unsuccessful claims that are "based on different facts and legal theories" than successful claims. *Hensley*, 461 U.S. at 434-35. If the plaintiff's claims all share "a common core of facts or [are] based on related legal theories," the litigation should be viewed as a whole. *Id*. Accordingly, district courts have consistently declined to subtract hours for unsuccessful claims that are legally or factually intertwined with claims on which the plaintiff ultimately prevailed, but they have reduced lodestar hours for wholly unrelated claims. *See e.g.*, *Pinner v. Budget Mortgage Bankers, Ltd.,* 336 F. Supp.2d 217, 222 (E.D.N.Y. 2004) (unsuccessful sexual

harassment-hostile work environment claim "inextricably linked" to successful retaliation claim; unsuccessful Title VII religious and gender discrimination claims deemed unrelated); *Shannon v. Fireman's Fund Ins. Co.*, 156 F. Supp.2d 279, 303 (S.D.N.Y. 2001) (unsuccessful disparate impact claim sufficiently related to disparate treatment claim to deny lodestar reduction; abandoned and unrelated disability discrimination and ERISA claims warranted modest reduction).

The success that TWG achieved for Brady in this case was neither Pyrrhic nor *de minimis*. To the extent some substantive claims did not succeed, they were inextricably intertwined with others that did. The one aspect of this part of the defendants' argument that merits any discussion is Brady's failed attempt to recover on a state law tort theory of intentional infliction of emotional distress. In essence, the defendants argue that because the jury necessarily found that they behaved properly after Brady was transferred from the store parking lot to the food department, a claim grounded on conduct after that transfer is sufficiently distinct from the successful claims to warrant a reduction. *See* Fee Opp. at 13-14. The argument is creative, but it does not persuade me. All of Brady's claims have as a central concern the manner in which his disability influenced the way that he was hired and supervised during his brief tenure at Wal-Mart, and at the crux of each claim is Brady's assertion that the defendants engaged in discrimination on the basis of his disability. As is often true of lawsuits arising from alleged deprivations of civil rights, all of Brady's claims "involve a common core of facts" and "related legal theories." *Hensley*, 461 U.S. at 435.

TWG's success on Brady's behalf has not been complete or without setbacks along the way.  But an attorney who loses no battles is not trying hard enough.  I therefore decline the defendants' invitation to reduce the lodestar award.

4.      Award

Based on the foregoing analysis, I award Brady a total of $601,355 as reimbursement of the reasonable attorneys' fees he incurred in this litigation, as set forth in the following table:

| Attorney | Request | | | Award | | |
|---|---|---|---|---|---|---|
| | Hourly Rate | Hours | Total Fee | Hourly Rate | Hours | Total Fee |
| Wigdor (partner) | $450 | 942 | $423,900.00 | $350 | 854.5 | $299,075.00 |
| Gilly (partner) | $450 | 169.6 | $76,320.00 | $350 | 140.4 | $49,140.00 |
| Thompson (partner) | $450 | 3.6 | $1,620.00 | $350 | 3.3 | $1,155.00 |
| le Roux (associate) | $300 | 930.7 | $279,210.00 | $200 | 822.5 | $164,500.00 |
| Goodstadt (associate) | $350 | 40.1 | $1,435.00 | $225 | 37.2 | $8,370.00 |
| Mallios (associate) | $325 | 8.7 | $2,827.50 | $175 | 8.0 | $1,400.00 |
| Dougherty (associate) | $265 | 186.3 | $49,369.50 | $200 | 171.1 | $34,220.00 |
| Mendes (associate) | $300 | 132.0 | $39,600.00 | $200 | 122.3 | $24,460.00 |
| Webber (associate) | $350 | 0.8 | $280.00 | $225 | 0.0 | $0.00 |
| Varghese (associate) | $250 | 8.3 | $2,075.00 | $150 | 7.7 | $1,155.00 |
| Howell (paralegal) | $100 | 173 | $17,300.00 | $100 | 160.3 | $16,030.00 |
| Sanchez (paralegal) | $100 | 20 | $2,000.00 | $100 | 18.5 | $1,850.00 |
| **TOTAL** | **N/A** | **2,615.1** | **$895,937.00** | **N/A** | **2,345.8** | **$601,355.00** |

C.    Other Costs

Reasonable out-of-pocket expenses are generally reimbursed as a matter of right in connection with an award of attorneys' fees.  *See Duke*, 2003 WL 23315463, at *6.  Brady seeks reimbursement for taxable and discretionary costs totaling $45,254.82.  The defendants argue that I should exclude the costs associated with two expert witnesses whose testimony was only relevant to the unsuccessful constructive discharge claim.  Fee Opp. at 23.  Having found the hours spent on this factually interrelated claim to be compensable, it is likewise appropriate that the associated costs be included in the fee award.

The defendants also ask me to exclude certain photocopying expenses because the submitted records do not document the quantity of pages copied and certain overnight delivery charges that they argue were unnecessary.  *Id*. at 23-24.  Brady did not submit evidence of the number of pages copied internally.  Brady did submit evidence that the cost of internal photocopying is twenty cents per page and thus I can readily infer the quantity of pages from the amounts billed.  Gentile Dec. ¶ 2.  I do, however, find it appropriate to reduce the requested rate of in-house photocopying by half, for a total of $2,464.60.  Ten cents per page is more consistent with a reasonable commercial rate.  *See King Vision Pay-Per-View Corp., Ltd. v. Tardes Calenas Moscoro*, *Inc*., 2004 WL 473306, at *5 (S.D.N.Y. March 12, 2004) (reducing the rate of in-house photocopying from 75 cents to ten cents per page and noting that "counsel may not build a profit into costs incurred in-house when they seek to shift those costs to an adversary").  I find that the requested costs for outside photocopying are adequately documented and thus Brady is entitled to recover the full amount of these costs.

With regard to the overnight delivery charges, I agree with Brady that using such services to transmit materials requiring immediate attention to an attorney who is away from the office during a weekend or vacation is a routine practice. Fee Reply at 10. As a result, I award Brady a total of $42,790.22 in costs other than attorneys' fees.

D.    Interest

Brady's argument that he is entitled to pre-judgment interest on the compensatory damage award is incorrect as a matter of law. I awarded the full compensatory damages to Brady's state law claims to afford maximum recovery. *See* DE 111 at 9. New York precludes the award of prejudgment interest on mental pain and suffering damages awarded for violations of that state's law. *See Kuper*, 2003 WL 2335011, at *6 (citations omitted); *see also* CPLR § 5001 (McKinney 2006). Had the compensatory damages been awarded for the violation of a federal right, it would have been within my discretion to award prejudgment interest, *see Gilbert v. Hotline Delivery*, 2001 WL 799576, at *4 (S.D.N.Y. July 10, 2001), but that is not what happened here.

The punitive damages were awarded on Brady's federal law claims pursuant to 42 U.S.C. § 1981(a). Brady does not appear to request prejudgment interest on that award. For the sake of a complete record I note that as a matter of federal law, prejudgment interest is not available on punitive damage awards. *See Wickham Contracting Co., Inc. v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 955 F.2d 831, 833-34 (2d Cir. 1992) (noting that because punitive damages are a penalty and not awarded as compensation, pre-judgment interest is not necessary to make a party whole and would in fact result in over-compensation).

The defendants do not appear to challenge Brady's request for post-judgment interest. As a plaintiff who prevailed on a federal claim, Brady is entitled to interest on his entire damage

award "from the time damages are reduced to an enforceable judgment to the time the defendant pays the judgment." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 55 (2d Cir. 1998) (quoting *Andrulonis v. United States*, 26 F.3d 1224, 1230 (2d Cir. 1994)); *see* 28 U.S.C. § 1961(a). Because there was an enforceable judgment on June 21, 2005, Brady is entitled to post-judgment interest from that date. However, interest should only accrue on the reduced amount of the judgment. The proper rate is statutorily set as the average rate of return on one-year Treasury-bills for "the calendar week preceding judgment." 28 U.S.C. § 1961(a). That rate for the relevant time period here at issue is 3.39 percent. *See* Board of Governors of the Federal Reserve, Selected Interest Rates, Statistical Release H-15 (June 20, 2005), *available at* http://www.federalreserve.gov/releases/h15/20050620/ (visited on September 29, 2006).

V.      Conclusion

For the reasons set forth above, I dispose of the pending motions as follows:

A.      I deny the defendants' motion for judgment as a matter of law.

B.      I deny the defendants' motion for a new trial in all respects save one: if Brady does not file with the Clerk of the Court on or before October 30, 2006, an acceptance of remittitur of compensatory damages to the amount of $600,000, I will set a date for a new trial solely on the issue of compensatory damages.

C.      In the event that Brady does accept remittitur, I award him a total of $644,145.22 in costs, consisting of reasonable attorneys' fees in the amount of $601,355.00 and expenses in the amount of $42,790.22. I will entertain a renewed application for fees and costs in the event of a new trial on the issue of compensatory damages.

D.      I deny Brady's application for prejudgment interest.

E.     I grant Brady's application for post-judgment interest; specifically, I find that

Brady is entitled to simple interest at an annual rate of 3.39 percent on the award of both

compensatory and punitive damages for the period starting on June 21, 2005 and ending on the

date the judgment is paid.

**SO ORDERED.**

Dated: Brooklyn, New York
       September 29, 2006

                                                    /s/ James Orenstein
                                                    JAMES ORENSTEIN
                                                    U.S. Magistrate Judge